In re Patricia Ruth BREECE, Debtor.

Fred W. WOODSON, Trustee, Plaintiff,

v.

TOM BELL LEASING, Defendant.

Bankruptcy No. 80–00513.
Adv. No. 80–0450.

United States Bankruptcy Court,
N.D. Oklahoma.

March 4, 1986.

Fred W. Woodson, Tulsa, Okl., for plaintiff.

Allen Klein and Bozena Y. Callahan, Tulsa, Okl., for defendant.

## MEMORANDUM DECISION AND ORDER

MICKEY D. WILSON, Bankruptcy Judge.

Fred W. Woodson, Trustee, brings this adversary proceeding against Tom Bell Leasing, to determine priority of conflicting interests in certain motor vehicles or their proceeds. The issue is whether written agreements concerning these vehicles, and purporting to be leases, should be treated as unperfected security agreements.

After complaint and answer, at a hearing on March 16, 1982, it was determined that the parties would submit this matter for decision upon stipulation and briefs. However, the matter comes before this Court on plaintiff Trustee's motion for summary judgment. For purposes of ruling on this motion for summary judgment, therefore, this Court will limit its findings to those facts which have been stipulated to, or which, from the record herein, are undisputed.

On July 17, 1980, a voluntary petition for relief under 11 U.S.C. Chapter 7 was filed in this Court by Patricia Ruth Breece, d/b/a Designer Doors and Tailored Tuff Ornamental Iron (Debtor). Fred W. Woodson was appointed Trustee of Debtor's

bankruptcy estate, and has continued in that capacity to the present time.

On the date of filing in bankruptcy, Debtor was in possession of three motor vehicles, namely: One 1978 GMC van; one 1978 Chevrolet pickup; and one 1979 Pontiac Bonneville. After filing in bankruptcy, Debtor delivered possession of these vehicles to the Trustee.

Debtor had acquired these vehicles from Tom Bell Leasing, pursuant to three written agreements, namely: The 1978 van by agreement dated March 7, 1978; the 1978 pickup by agreement dated September 15, 1978; and the 1979 Bonneville by agreement dated September 22, 1978. Tom Bell Leasing has never filed financing statements concerning these vehicles in any County in the State of Oklahoma. There being no indication in the record to the contrary, this Court finds that no lien entry form concerning any security interest of Tom Bell Leasing in these vehicles was ever delivered to the Oklahoma Tax Commission or any of its motor license agents.

On October 29, 1980, Tom Bell Leasing filed in this Court its Secured Claim No. 18, for a balance due from Debtor of $14,265.59, and listing these vehicles as security. On December 8, 1980, the Trustee filed his complaint herein, objecting to Tom Bell Leasing's claim of a perfected secured interest in the vehicles; and seeking disallowance of said claim save as an unsecured claim against the bankruptcy estate, and authority to sell the vehicles on behalf of said estate, free and clear of Tom Bell Leasing's claimed security interest therein. On January 12, 1981, Tom Bell Leasing made answer, alleging that the agreements whereby Debtor acquired these vehicles were leases.

With Tom Bell Leasing's consent, the Trustee sold the vehicles for an aggregate amount of $9,200.00; deducted therefrom $1,190.00 for storage and auction costs; and retained the balance of $8,010.00 pending the outcome of this proceeding.

On July 14, 1982, the parties filed in this Court a stipulation as to various facts and issues. On November 10, 1982, the Trustee moved for summary judgment; and on November 24, 1982, Tom Bell Leasing responded thereto. On November 29, 1982, a hearing on the motion for summary judgment and response thereto was held before Rutledge, J. Thereafter, the matter was taken under advisement by this Court.

Attached to, and included in, the parties' stipulation are the written agreements whereby debtor acquired these vehicles from Tom Bell Leasing.

The three writings are copies of a single form consisting of two legal-size pages of dense print spangled with blanks and boxes. The only differences appear where the parties have filled in the blanks.

The form is designated "Lease Agreement" between "Lessor" Tom Bell Leasing and "Lessee" Tailored Tuff Ornamental Iron by its owner Patricia Ruth Breece; requires that title remain in Lessor, Par. 12; and provides that "nothing contained in this Lease shall be deemed to give Lessee any rights ... except as a Lessee," Par. 4.

The form explicitly excludes any option to purchase, Par. 12.

The form provides alternatives, whereby the duty to obtain insurance may be placed on either Lessor or Lessee, by marking the appropriate box. In each of the three agreements, said duty is placed upon the Lessee. The form requires Lessee to indemnify Lessor against all loss incurred in operation of each vehicle, Par. 6, 16; to pay for all maintenance and repairs unless otherwise provided by addendum, no such addenda appearing, Par. 7; and to "pay all licenses, taxes, titles, registration and fees," Par. 8. The form makes no specific mention of sales tax.

The form provides for a mileage charge, designated "Additional Rent," for all miles in excess of a "Total Mileage Allowance," Par. 2.

Each lease form provides for a lease for a fixed term of months; and for regular monthly payments designated "Fixed Monthly Rental." The greater part of this "rental" is "credited" against a sum de-

nominated "Cash Value." The remainder of "Cash Value" not "credited" against is designated "maximum amount of liability of the Lessee." Upon expiration of the fixed term, Lessee is to return the vehicle to Lessor; Lessor in turn is obligated to sell the vehicle, and pay itself the proceeds up to the "maximum amount of liability of the Lessee." If the sale proceeds are *less* than the "maximum amount of liability of the Lessee," Lessee is required to pay the deficiency to Lessor. If the sale proceeds are *more* than the "maximum amount of liability of the Lessee," Lessee is entitled to receive payment of the excess from Lessor. Such excess is designated "Reduction in rental," Par. 2, 4.

The agreement dated March 7, 1978, concerning the 1978 GMC van, establishes a term of 36 months; a "Cash Value" of $7,978.87; a "Fixed Monthly Rental"; of $247.34; a "Monthly Credit against Cash Value" of $179.52 for a total "credit" of $6,462.72 over the entire term; and a remained or "maximum amount of liability of the Lessee" of $1,516.15.

The agreement dated September 15, 1978, concerning the 1978 Chevrolet LUV pickup, establishes a term of 24 months; a "Cash Value" of $5,443.02; a "Fixed Monthly Rental" of $176.80; a "Monthly Credit against Cash Value" of $122.47 for a total "credit" of $2,939.28 over the entire term; and a remainder or "maximum amount of liability of the Lessee" of $2,503.74.

The agreement dated September 22, 1978, concerning the 1979 Pontiac Bonneville, establishes a term of 24 months; a "Cash Value" of $8,346.40; a "Fixed Monthly Rental" of $250.39; a "Monthly Credit against Cash Value" of $166.73 for a total "credit" of $4,001.52 over the entire term; and a remainder or "maximum amount of liability of the Lessee" of $4,340.08.[1]

The form provides that the lease may be terminated after 12 months but before expiration of the full fixed term, with Lessor's permission. In such event, the vehicle is to be sold by Lessor as if the lease term had run its full course; and Lessee is obligated to pay Lessor accrued "Rental" plus the difference between the sale proceeds and "Cash Value" less accrued "Rental," Par. 4.

## CONCLUSIONS OF LAW

A motion for summary judgment may be granted if the pleadings and other materials presented in support of the motion "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," Rule 56(c), F.R.Civ.P. Here, the parties have stipulated that there is no issue as to the terms of the written agreements between debtor and Tom Bell Leasing. The question remains whether these undisputed terms entitle the movant Trustee to judgment as a matter of law.

Generally, before July 1, 1979, a security interest in a vehicle subject to Oklahoma law was perfected by filing a financing statement, pursuant to the Oklahoma (Uniform) Commercial Code, 12A O.S.A. § 9–401(1)(A). After July 1, 1979, such a security interest can be perfected only by delivery of a lien entry form to the Oklahoma Tax Commission or one of its motor license agents, pursuant to 12A O.S.A. § 9–302(3) and (4), and the Oklahoma Motor Vehicle Act, 47 O.S.A. § 23.2b(A). See *In re Haning: Stainer, Trustee v. Bank of Tulsa*, 35 B.R. 242 (Bankr.N.D.Okla.1983); *In re The Chief Freight Lines Co.: The Chief Freight Lines Co., et al., v. Strick Finance Co., et al.*, 37 B.R. 436 (Bankr.N.D. Okla., 1984); and cases cited therein. However, 47 O.S.A. § 23.2b(D) provides that a security interest in a vehicle, properly perfected by financing statement before July 1, 1979, may remain effective thereafter pursuant to 12A O.S.A. § 9–403(3), or may be re-perfected by lien entry form. Tom Bell Leasing has never utilized any of these alternatives; and has never perfected

---

**1.** This is the figure shown on the document itself. This Court's calculations indicate a slightly different "maximum amount of liability," i.e., $4,344.88.

any security interest in any of these vehicles in the State of Oklahoma.

█ If Tom Bell Leasing is an unperfected secured creditor of this Debtor, its interest in these vehicles is inferior to that of the Trustee, 11 U.S.C. § 544, 12A O.S.A. § 9–301(1)(b). However, an owner-lessor is not required to have or perfect any security interest in his own property; and any vehicles which are actually owned by Tom Bell Leasing are no part of this Debtor's bankruptcy estate. The question is whether, in transferring possession and use of these vehicles to Debtor, according to the terms of the written agreements herein, Tom Bell Leasing retained a lessor's ownership interest, or merely a seller's or financer's security interest.[2]

█ The form of agreement herein is labeled "Lease," and *prima facie* indicates retention by Tom Bell Leasing of a lessor's ownership interest. But the perfection requirements and priority provisions of the Commercial Code will apply "to any transaction (regardless of its form) which is intended to create a security interest in personal property," 12A O.S.A. § 9–102(1)(a). The label "Lease" is therefore only the beginning of the inquiry; this Court must proceed to determine whether the so-called "lease" is "intended to create a security interest."

█ Whether a purported lease is "intended" as security is to be decided according to "the facts of each case," 12A O.S.A. § 1–201(37). The Court of Appeals of this Circuit has made it quite clear that the basic issue is whether or not a lease is the *functional* equivalent of a security agreement; so that inquiry whether a lease is "intended" as security is not limited to the mere subjective intent of the parties, but extends to the objective "substance of the transaction" as perceived by the trier of fact, *In re Fashion Optical, Ltd.: Steele v. Gebetsberger,* 653 F.2d 1385, 1390 (CA 10, 1981); *Eddies Sales & Leasing, Inc. v.*

*Federal Insurance Co.,* 634 F.2d 1050, 1053–1054 (CA 10, 1980). Where "the facts of [the] case" consist of the terms of an agreement as set forth within the four corners of an instrument, the question of "intent" is one of law, *Percival Construction Co. v. Miller & Miller, Inc.,* 532 F.2d 166, 171 (CA 10, 1976), aff'g 387 F.Supp. 882 (W.D.Okla., 1973).

█ In *In re Fashion Optical, Ltd.,* supra, the Court of Appeals promulgated a "four-step approach," *Id.* at 1388, derived from 12A O.S.A. § 1–201(37), for determining whether a purported lease is intended as security. This "four-step approach" reduces to a two-part proposition: A transaction purporting to be a lease will be deemed a secured transfer of ownership *if* (1) "a purchase option exists and it or other items in the 'lease' permit the 'lessee' to become full owner by merely paying no or nominal consideration after complying with its terms" *or* (2) "the facts otherwise expose economic realities tending to confirm that a secured transfer of ownership is afoot," *Id.*

The form of agreement herein lacks a purchase option, and so must be evaluated under the second of *In re Fashion Optical, Ltd.'s* two tests. In ruling on this motion for summary judgment, this Court must decide whether the lease terms alone, as a matter of law, "expose economic realities tending to confirm that a secured transfer of ownership is afoot."

A recent case, turning on the second of *In re Fashion Optical, Ltd.'s* two tests was *In re Tulsa Port Warehouse Co., Inc.: Adelman, Trustee v. General Motors Acceptance Corp.,* 690 F.2d 809 (CA 10, 1982); aff'g 4 B.R. 801, 29 U.C.C.R. 1608 (D.C., N.D.Okla., 1980); aff'g unreported decision by this Court, per Rutledge, J., No. 79–B–0185, March 6, 1979—hereinafter referred to as *"Tulsa Port."* The Trustee proposes that the instant case "fits squarely within the corners of" the *Tulsa Port* case.

---

**2.** Tom Bell Leasing's claim asserts a perfected security interest, while Tom Bell Leasing's defense to the Trustee's objection to said claim asserts an ownership interest. For purposes of

ruling on this motion for summary judgment, no legal significance will be given to the inconsistency of these positions.

384

There is no need—and, under the rule of *stare decisis,* no opportunity—to make a *de novo* appraisal of whether the facts of the instant case "confirm that a secured transfer of ownership is afoot," unless some legally significant difference between the facts of this case and of the *Tulsa Port* case renders the *Tulsa Port* precedent inapplicable.

Whether the Trustee is entitled to judgment as a matter of law thus becomes a matter of precedent. The precise issue before this Court is, not whether the facts of this case show that these leases are intended as security, but whether this case is legally distinguishable from *Tulsa Port.* Determination of this question requires consideration of both the facts and the law in *Tulsa Port*—the facts, in order to determine what fact differences, if any, there are between this case and *Tulsa Port;* the law, in order to determine whether any such differences are legally significant.

## II—*The Tulsa Port Case*

Tulsa Port Warehouse Co., Inc. (Debtor) entered into four written agreements with Chuck Naiman Buick Co. and General Motors Acceptance Corp. (Naiman and GMAC respectively), whereby Debtor acquired possession and use of four motor vehicles. When Debtor filed in bankruptcy, prior right to the vehicles was contested between the Trustee, who asserted that Debtor had purchased the vehicles and that any security interest retained by Naiman-GMAC was unperfected, and Naiman-GMAC, who asserted that Debtor had merely leased the vehicles.

The four writings were copies of a standard form. The form was designated "Non-Maintenance Lease Agreement," and had no purchase option. The case therefore turned on the second of *In re Fashion Optical, Ltd.'s* two tests; namely, whether, despite the lease form, "the facts ... expose economic realities tending to confirm that a secured transfer of ownership is afoot." This Court, per Rutledge, J., held that the transactions in *Tulsa Port* were

not true leases, but were sales; and that the lease forms were intended as security agreements incident to such sales. The District Court and the Court of Appeals affirmed. That secured transfers of ownership were indeed afoot was confirmed by: (1) the concentration of all incidents of ownership of the vehicles, save bare legal title, in lessee; (2) the effect of termination provisions, which removed any reversionary interest from lessor and established an equity in the vehicles in lessee; (3) economic equivalence of the transactions with secured sales. A single minor factor, which alone was consistent with a true lease, was disregarded as of no consequence.

### (A) *Concentration of Incidents of Ownership in Lessee*

The *Tulsa Port* lease form provided that title to each vehicle remained in lessor. However, lessee was required to assume all expenses for maintenance and repair, fees and liabilities for operation, and risk of loss; and to pay sales tax. "As a practical matter, the lessee [held] all the incidents of ownership except bare legal title," *Id.* Of course, the party who has the rights and duties of an owner may be considered to be the true owner.[3]

### (B)—*Effect of Termination Provisions*

The *Tulsa Port* leases were for fixed terms of either 24 or 36 months. The lease form provided for choice of "closed-end" or "open-end" type of lease, by marking the appropriate box; all four were made "open-end" types. If the "closed-end" type had been selected, then at the end of the fixed term the vehicle would simply have been returned to Lessor, and the obligations of both parties would have been at an end. But the "open-end" type called for certain reciprocal obligations to continue after expiration of the fixed term. Lessee's payment obligations were not limited to periodic rental payments; in addition to periodic "rent," lessee was liable for a sizeable lump-sum payment *after* termination of the

3. "Incidents of ownership" aside, payments of a *sales* tax on a transaction is some evidence that

the parties acknowledge the transaction to be a *sale.* But see Part III(A) of this opinion, infra.

fixed lease term. After termination, lessee would return the vehicle to lessor; lessor was then *required* to sell it, to apply the proceeds against the amount of lessee's remaining liability, and to account to lessee for any difference between the sale proceeds and the amount of lessee's remaining liability. If the sale proceeds were *less* than the amount still owing by lessee, lessee was required to pay the deficiency to lessor. If the sale proceeds were *more* than the amount still owing by lessee, lessee was entitled to receive payment of the excess from lessor. Lessee was permitted to terminate before expiration of the full fixed term. But in such event, lessor was still required to sell the vehicle; the proceeds were still to be set off against a residual liability, which was calculated with the aid of the so-called "Rule of 78s;" and lessee still remained liable for any deficiency, and entitled to any surplus.

By definition, a lease is an arrangement whereby the use of property is temporarily reserved to one who is not the owner of the property. When the lease term ends, the lessor thereafter "can do as he pleases with his property," *Id.*, D.C. at 1614. But the "open-end" provisions of the *Tulsa Port* form of agreement required that, on termination, lessor after recovering the vehicle must sell it, even if lessee terminated before expiration of the full fixed term. Thus, from the moment the agreement was signed, at the outset of the "lease," lessor had lost any reversionary interest in the property itself, any expectancy that some day he might "do as he pleases with" it.

Nor was the lessor permitted to "do as he pleases with" the vehicle's proceeds. Lessor was entitled to these proceeds only up to the amount of Lessee's remaining obligation. Any deficiency must be made up by lessee; but any excess must be paid over to lessee. Thus the real risk of loss and expectancy of gain rested with lessee, not lessor. The case of *In re Tillery: Bill*

*Swad Leasing Co. v. Stikes*, 571 F.2d 1361 (CA 5, 1978), held that similar termination provisions established an equity in the "leased" property in the Lessee; and that acquisition of an equity in property indicates that the property has been sold rather than leased. The District Court and Court of Appeals explicitly approved the rule of *In re Tillery*, supra, and this Court's application of it to the transactions in *Tulsa Port.* See *Tulsa Port*, CA at 811, D.C. 4 B.R. at 807–808, 29 U.C.C.R. at 1617–1618.

In summary, under the "open-end" termination provisions of the *Tulsa Port* leases, lessor remained able to recover and dispose of "its own" vehicle only to the extent necessary to ensure full payment of lessee's remaining monetary obligations. Of course, such is essentially a security interest, not a reversionary ownership estate.[4]

### (C) *Economic Equivalence With Retail Sale*

A fundamental "economic reality" is value, measured in money. The monetary obligations and expectancies of the parties to the *Tulsa Port* leases were set forth in the form of an intricate calculation, whose elements included:

(1) "Original Value of Vehicle," from which trade-in amounts, if any, might have been deducted;

(2) "Agreed Depreciation Value," purportedly an estimate of the vehicle's sale value at the end of the fixed term. This was the amount lessee still owed after "open-end" termination, and against which sale proceeds would be set off. Thus, if sale proceeds were *less* than "Agreed Depreciated Value," lessee was required to pay the deficiency, designated "Additional Rental," to lessor. If sale proceeds were more than "Agreed

---

**4.** It might be noted that, after "open-end" termination and sale of the vehicle, lessor would lose the one remaining incident of ownership that he had retained during the lease term, i.e., bare legal title, which would pass to the used-car purchaser. It is indeed a curious 'lease' whose termination, rather than restoring full ownership to the lessor, *extinguishes* whatever ownership had remained in the lessor during the lease term!

Depreciated Value," lessee was entitled to receive payment of the excess.

(3) "Total Amount of Fixed Monthly Rentals To Be Credited Against Original· Value," a figure arrived at by subtracting "Agreed Depreciated Value" from "Original Value;"

(4) "Total Amount of Fixed Monthly Rentals NOT To Be Credited Against Original Value," a figure whose source was not made explicit in the lease form;

(5) "Monthly Rental," calculated by adding "Total ... Rentals To Be Credited" and "Total ... Rentals NOT To Be Credited," then dividing the sum by the number of months in the fixed term.

The casual reader (if not completely baffled by these complexities) might have supposed that these agreements like other leases, set lessee's monetary obligations by multiplying. monthly rent times the number of months in the lease term, with some sort of ultimate setoff or opportunity for partial recoupment of rent, provided out of the goodness of Naiman-GMAC's collective corporate heart. But a closer look at the lease terms revealed something quite different.

According to the lease formula, lessor was guaranteed to receive (1) "Agreed Depreciated Value," either from sale proceeds or payment by the lessee, *plus* (2) "Total ... Rentals To Be Credited Against Original Value," *plus* (3) "Total ... Rentals NOT To Be Credited Against Original Value"—no more, no less. But (1) "Agreed Depreciated Value" *plus* (2) "Total ... Rentals To Be Credited Against Original Value" add up simply to "Original Value."[5] Therefore, lessor's expectancy really consisted of only two elements, "Original Value" *plus* (3) "Total ... Rentals NOT To Be Credited Against Original Value"—no more, no less. Lessee was potentially liable for the same sum, although he was entitled to have the vehicle sold and any proceeds used to reduce his own out-of-pocket obligation. These two key figures, "Original Value" and "Total ... Rentals NOT To Be Credited Against Original Value," were not derived from any other elements in the lease formula. These two figures were given, and the lease formula built around them.[6]

This Court found that "Original Value" was "an amount equivalent to retail value," *Id.,* B.C. at 4. This Court also determined that "[Total ... Rentals NOT to be Credited Against Original Value" "... euphemistically described ordinary interest without disclosure as to its rate," *Id.,* B.C. at 8. The latter was given away by the lease provision that such "Rentals" were to be modified on premature termination by the so-called "Rule of 78s," which was a formula for modifying finance charges, *Id.* Therefore, lessor's total expectancy and

---

5. The lease provides that "Total ... Rentals To Be Credited Against Original Value" equals "Original Value" minus "Agreed Depreciated Value." Substituting these factors for "Total ... Rentals To Be Credited Against Original Value" among the elements of lessor's guaranteed receipts, it appears that lessor will receive (1) "Agreed Depreciated Value" plus (2) "Original Value" minus "Agreed Depreciated Value"— which equals simply "Original Value." (If "Original Value" = a, and. "Agreed Depreciated Value" = b, such that "Total ... Rentals To Be Credited Against Original Value" = (a — b), then b + (a — b) = a. At no point in the *Tulsa Port* proceedings did Naiman-GMAC contend that the law of algebra should be overruled).

6. The other factors in the formula may be altered without affecting "Original Value" or "Total ... Rentals NOT To Be Credited Against Original Value." Thus, if "Agreed Depreciated Value" were reduced, "Total ... Rentals To Be Credited Against Original Value" would increase, since these two must always add up to exactly "Original Value." Such variations could serve to alter a lessee's payment schedule, by providing for larger monthly payments and a smaller lump-sum liability after termination, or vice versa, as desired. Although "Agreed Depreciated Value" purported to be an estimate of sale value of a used car, it could be set quite arbitrarily without affecting the *total* liability of lessee and profit of lessor. "Monthly Rental" is figured *from* "Total ... Rentals NOT To Be Credited Against Original Value" and that part of "Original Value" which is not postponed under the name of "Agreed Depreciated Value" and is labeled "Total ... Rental To Be Credited Against Original Value." The actual process involved is not crediting rent against value, but just the opposite: Deriving rent *from* value.

lessee's maximum obligation equaled retail value ("Original Value") plus interest ("Total ... Rentals NOT To Be Credited Against Original Value") as if in an ordinary rental sale financed by the seller or an allied agency. This Court further determined that "the obligation of the 'lessor' [sic; 'lessee'] to pay is the equivalent of a note for the agreed net retail value plus financing charges to be paid in fixed monthly installments and a 'ballooned' payment at term end," *Id.* The District Court pointed out that, even though the "open-end" provisions required resale of the vehicle, "the practical effect of this arrangement is the same as if lessee purchased the car, then sold it two or three years later and used the proceeds to pay off the note," *Id.*, D.C. 4 B.R. at 805, 29 U.C.C.R. at 1613.[7] Before the Court of Appeals, "defendants conceded at oral argument that there is no economic difference to the lessor between the lease arrangement here and a secured transfer of property," *Id.*, CA 10 at 812. The Court of Appeals agreed with the lower courts that there was no economic difference to the lessee either, *Id.*

In short, the search for "economic realities" undertaken at the command of *In re Fashion Optical, Ltd.*, supra, had discovered a type of retail automobile sale. The lease forms were only an "elaborate fiction," *Id.*, B.C. at 7.

### (D) *The Contrary Factor*

The *Tulsa Port* agreements required lessee to pay $.06 per mile "Excess Mileage Charge" for each mile each vehicle was driven over 15,000 miles per year. "There is no evidence [this provision] was ever operative" and in any event, "the excess mileage paragraph is inexplicable in the context of the whole agreement," D.C. 4 B.R. at 807, 29 U.C.C.R. at 1616.

### III—*Comparison of Tulsa Port with the Instant Case*

#### (A) *As to Concentration of Incidents of Ownership in Lessee*

■ The agreements in this case require lessee to obtain insurance: to "pay all li-

censes, taxes, titles, registrations and fees;" to pay for all maintenance and repairs; and to indemnify lessor against all loss. In these respects, these agreements do not differ from those in *Tulsa Port*. In order to give Tom Bell Leasing the benefit of any doubt, as is proper in ruling on its opponent's motion for summary judgment, 6 *Moore's Federal Practice* (2d Ed.1982) Par. 56.15[3] at 469 n. 8 and cases cited thereunder, this Court will assume that no sales tax was paid by either party on these transactions. If the courts in *Tulsa Port* had relied on the payment of sales tax as a sort of "admission" by conduct that those transactions were sales, the absence of any such conduct in these transactions might constitute a legally significant variation in facts. But the *Tulsa Port* opinions mention sales tax only in the context of various incidents of ownership which were placed in lessee, CA at 811–812; DC 4 B.R. at 806–807, 29 U.C.C.R. at 1614–1615; BC at 10. Strictly speaking, sales tax is an incident of *transfer* of ownership, while the other factors mentioned in the preceding paragraph are more properly incidents *of ownership* itself. In this case, it is obvious that such incidents *of ownership* are in lessee, and that they got there from lessor. The question whether, in addition, the transfer was conducted with all the incidents of a formal sale, is merely cumulative (it is not this Court's business to collect sales tax which might be owing to the taxing authority). Therefore, it remains true in this case, just as in *Tulsa Port,* that "as a practical matter, the lessee holds all the incidents *of ownership* except bare legal title," CA at 812 (emphasis added); and the absence of specific provision for payment of sales tax by lessee in these agreements is insufficient to take this case out of the rule of *Tulsa Port.*

#### (B) *As to Effect of Termination Provisions*

The agreements in this case provide for termination by return of the vehicles to

---

**7.** This language is attributed to "the trial judge" in the Court of Appeals' opinion at p. 812.

lessor, obligatory sale of the vehicles by lessor, and application of the sale proceeds against lessee's predetermined residual liability, lessee being liable for any deficiency and entitled to any surplus. Thus, lessor is obligated to dispose of property he supposedly owns, while lessee bears the loss or receives the gain from such disposition. In these respects, these agreements do not differ from the "open-end" termination arrangement in *Tulsa Port*. It follows that these agreements deprive lessor of any reversionary interest in the vehicles, and establish an equity in the vehicles in lessee; and in that respect are indicated to be secured sales rather than true leases, just as in *Tulsa Port*.

### (C) *As to Economic Equivalence With Sale*

In *Tulsa Port*, the determination of economic equivalency with a sale rested on findings that "Original Value" equaled retail price, and that "Total ... Rental NOT Credited Against Original Value" equaled interest. If this motion for summary judgment based on the *Tulsa Port* precedent is to be granted, facts which supported the findings in *Tulsa Port* must also appear in this case. That is, the lease formulas in the agreements in this case must contain elements comparable to "Original Value" and "Total ... Rental NOT To Be Credited Against Original Value"; while facts which enabled the Courts in *Tulsa Port* to equate these elements with retail price plus interest, must appear here also.

It is obvious that "Cash Value" occupies a position in the agreements in this case analogous to "Original Value" in *Tulsa Port;* and that "Total ... Rental ... not to be credited against cash value" is likewise analogous to "Total ... Rental NOT To Be Credited Against Original Value" in *Tulsa Port.*

In *Tulsa Port*, the basis for the finding that "Original Value" equaled retail price was not stated. Such determination might have been based on the terms "Original *Value of Vehicle*" and "Agreed Depreciated *Value of Vehicle*" appearing in the lease. Such suggestive labels do not appear in the agreements in this case—i.e., nothing says what "Cash Value" is the value of. In *Tulsa Port*, evidence was introduced at trial of prices of comparable vehicles at acknowledged retail sales; but such extrinsic evidence is not before this Court on this motion for summary judgment.

In *Tulsa Port*, the fact that "Total ... Rental NOT To Be Credited Against Original Value" equaled interest, was given away by mention in the leases of the "Rule of 78s," formula for modifying finance charges. There is no such giveaway in the agreements in this case. In *Tulsa Port*, evidence was introduced at trial of finance charges in comparable overt retail sales; but such extrinsic evidence is not before this Court on this motion for summary judgment.

This motion for summary judgment cannot be sustained, unless these differences in available facts are not legally significant —i.e., unless the money due lessor from lessee in *Tulsa Port* would have been found to equal retail price plus interest, even if the suggestive lease terms, mention of the "Rule of 78s," and extrinsic evidence of sales prices and finance charges, had been lacking.

The basic process employed in evaluating each agreement in *Tulsa Port* was "to *analyze the contract* to determine what *rights and obligations* have been created." DC 4 B.R. at 805, 29 U.C.C.R. at 1613. The *Tulsa Port* agreements established a scheme of "rights and obligations" such that, from the outset of the transaction, all incidents of ownership save bare legal title were vested in lessee; lessor's profit and lessee's liability were fixed; and, under "open-end" termination, disposition of the chattel by lessor was required, while lessee bore the risk of loss and expectancy of gain from such disposition. Given these "rights and obligations," one may ask whether the money due lessor from lessee could equal anything *but* retail price plus interest. If such amount was *less* than sales price plus interest, lessor had committed himself to

dispose of a car, as completely and irrevocably as if he had sold it outright, for *less* than the value plus interest that he could have obtained from a purchaser had he sold it outright. But if such amount was *more* than sales price plus interest, lessee had committed himself to assume all the burdens of maintenance and risk of loss of the vehicle, but without the benefit of ownership, for *more* than it would cost him to buy it outright. Such conduct by either party would be commercial nonsense. Such rights and obligations would not be assumed by parties in an arms' length commercial transaction, *unless* the money value of the deal was the equivalent of retail price plus interest.[8] Thus, the "rights and obligations" set up by the *Tulsa Port* agreements were themselves evidence that the moneys involved were equivalent to retail sales price plus interest. Other evidence, e.g. of suggestive expressions in the agreements, or of comparative amounts in acknowledged sales, was reassuring but cumulative and unnecessary.

If this implies that *Tulsa Port* could have been decided without trial, suffice to say that Judge Rutledge, in his discretion, gave Naiman-GMAC a "day in court" they may not have strictly deserved. The trial served to reinforce a conclusion already sufficiently supported by the "rights and obligations" set forth in the documents alone.

The agreements in this case set up precisely the same pattern of "rights and obligations" as did the agreements in *Tulsa Port*, i.e., concentration of incidents of ownership in lessee, and lack of reversion in lessor with equity in lessee. It follows that in this case, as in *Tulsa Port*, this pattern of rights and obligations itself establishes the economic equivalence of these transactions with sales—at least, to such extent that the burden of rebutting such showing passes to the opponent of the motion for summary judgment, see 6 *Moore's*

*Federal Practice* (2d ed. 1982 ¶ 56.13[3] at 56–483).

**(D)** *As To Excess Mileage Charge*

The agreements in this case include provisions for excess mileage charge, although the specific rate and mileage allowance are not easily found. Such provisions were held to be "inexplicable" and of no account in *Tulsa Port;* and they may likewise be disregarded here.

### IV—*Defendant's Argument*

Tom Bell Leasing proposed "that this proceeding ... can be distinguished from the case of *Tulsa Port* ... and that the transaction in question was one in the nature of a true lease." Tom Bell Leasing then points out that each agreement in this case (1) is designated "Lease"; (2) has no purchase option; (3) recites that the Lessee "shall be deemed" to acquire "no rights in the vehicle, except as a Lessee"; (4) contains provisions for termination before expiration of the full lease term; (5) provides for comprehensive insurance and places the risk of loss on lessee, which Tom Bell Leasing argues is only "to protect the interest of the lessor by encouraging the lessee to take the best possible care of the vehicle."

But every one of these things occurred in the *Tulsa Port* agreements, just as in the agreements herein. This series of non-distinctions fails either to rebut the Trustee's showing of economic equivalence with a sale, or to indicate any other ground for excepting this case from the precedent of *Tulsa Port.* Of course, if this case is controlled by the precedent of *Tulsa Port* any arguments Tom Bell Leasing might make for a reconsidered evaluation of "the substance of [this] transaction" cannot be heard.

### V—*Conclusion*

This Court concludes that the instant case is not legally distinguishable from *In*

---

**8.** Lessee might agree to pay more than the vehicle's retail sale value, if he expected to recoup the difference in tax savings. But this would not make the transaction any less a sale. An owner of a chattel is not likely to part with ownership for *less* than market value; he may well give it up for *more* than market value, if the purchaser himself is willing to pay an inflated price.

*re Tulsa Port Warehouse Co., Inc.,* supra, notwithstanding the absence from the agreements in this case of explicit provision for payment of sales tax and of certain suggestive expressions, and the absence of extrinsic evidence of comparable rental sales prices and finance charges. Therefore, under *stare decisis,* the precedent of *In re Tulsa Port Warehouse Co., Inc.,* supra, controls the decision of this case; and requires the determination that the agreements in this case were intended as security, for transactions which were sales and not true leases. These security agreements were not perfected. Therefore, the Trustee is entitled to judgment in his favor as a matter of law.

NOW, THEREFORE, the Trustee's motion for summary judgment is hereby granted. Judgment for the Trustee will be entered accordingly.

AND IT IS SO ORDERED.