**In re Leslie Floyd HARVEY, Debtor.**

**Fred W. WOODSON, Trustee, Plaintiff,**

**v.**

**GENERAL MOTORS ACCEPTANCE CORPORATION, Defendant.
(Three Cases)**

**In re Ronald Ray POLLARD, Debtor.**

**In re Carlene VERNON, Debtor.**

**Bankruptcy Nos. 85–02207, 86–00894 and 86–00830.**

**Adv. Nos. 86–0066, 86–0201 and 86–0216.**

United States Bankruptcy Court,
N.D. Oklahoma.

Dec. 10, 1987.

Fred W. Woodson, Tulsa, Okl., trustee.

Brian J. Rayment, Tulsa, Okl., for General Motors Acceptance Corp.

## MEMORANDUM DECISION AND ORDER

MICKEY DAN WILSON, Bankruptcy Judge.

Fred W. Woodson, Trustee, brought three adversary proceedings, each under a different Chapter 7 Bankruptcy case, against General Motors Acceptance Corporation, to determine priority of conflicting interests in certain motor vehicles or their proceeds. The issue is whether written agreements concerning these vehicles and purporting to be leases, should be treated as unperfected security agreements.

Pursuant to order filed August 8, 1986, the three adversary proceedings have been consolidated for trial and submitted for decision on stipulations and briefs. Upon consideration thereof, the Court finds and concludes as follows.

1. On December 9, 1985, Floyd Leslie Harvey ("Harvey;" "debtor") filed his vol-

untary petition for relief under 11 U.S.C. Chapter 7.

2. On that date, Harvey was in possession of one 1985 Pontiac Trans Am 2–door automobile, VIN # 1G2FW87F8FL651826. Harvey acquired the vehicle from General Motors Acceptance Corporation ("GMAC") pursuant to a written agreement dated September 17, 1985. On September 18, 1985, the State of Oklahoma, Department of Motor Vehicles, issued a Certificate of Title listing GMAC as owner of said vehicle.

3. On April 17, 1986, Carlene Vernon ("Vernon;" "debtor") filed her voluntary petition for relief under 11 U.S.C. Chapter 7.

4. On that date, Vernon was in possession of one 1985 Oldsmobile "98" Regency Coupe automobile, VIN # 1G3CW113XF1359935. Vernon acquired the vehicle from GMAC pursuant to a written agreement dated August 30, 1985. On September 5, 1985, the State of Oklahoma, Department of Motor Vehicles, issued a Certificate of Title listing GMAC as owner of said vehicle.

5. On June 3, 1986, Ronald R. Pollard ("Pollard;" "debtor") filed his voluntary petition for relief under 11 U.S.C. Chapter 7.

6. On that date, Pollard was in possession of one 1985 Cadillac Eldorado automobile, VID # 1G6EL5782FE660710. Pollard acquired the vehicle from GMAC pursuant to a written agreement dated July 30, 1985. On July 31, 1985, the State of Oklahoma, Department of Motor Vehicles, issued a Certificate of Title listing GMAC as owner of said vehicle.

7. GMAC has never filed any lien entry form relating to any of the above-mentioned vehicles ("the vehicles").

8. GMAC filed its proof of claim in each of the above-mentioned Chapter 7 cases, asserting a security interest in the vehicles.

9. Fred W. Woodson is the duly appointed, qualified and acting Trustee of all of the above-mentioned debtors' estates in bankruptcy.

10. The Trustee filed complaints, asserting that GMAC had not perfected its security interests in the vehicles, and seeking determination that the Trustee's interest in the vehicles is superior to GMAC's unperfected security interest and disallowance of GMAC's claim save as a general unsecured claim.

11. GMAC answered the Trustee's complaints, alleging that the agreements whereby debtors acquired the vehicles were leases, and asserting that GMAC was not mere holder of an unperfected security interest in, but was true owner of, the vehicles.

12. The parties agreed that GMAC would take possession of the vehicles from debtor, sell them, and deliver the proceeds to the Trustee, who would hold said proceeds pending disposition of these actions. The three actions were consolidated for trial.

13. On August 27, 1986, the parties filed their stipulation of facts.

14. Attached to and included in said stipulation are copies of the written agreements whereby debtors acquired these vehicles from GMAC ("the contracts").

15. Vernon's and Pollard's contracts are copies of a form designated "GMAC 671 DLP 2/85." Harvey's contract is a copy of a substantially identical form whose designation is unclear. For practical purposes, all three contracts are copies of the same form.

16. The form consists of two legal-size pages of print, the first page spangled with blanks and boxes. The only differences in the contracts appear where the parties have filled in the blanks.

17. The form is designated "Lease Agreement" and prominently labeled "GMAC Direct Leasing Plan." It identifies GMAC as "Lessor" and each debtor as "Lessee." ¶ 25 is entitled *"Ownership"* and recites as follows:

This is a lease only and Lessor remains the owner of the vehicle. [Lessee] will not transfer, sublease, rent, or do anything to interfere with Lessor's ownership of the vehicle. [Lessee] and Lessor agree that this lease will be treated as a true lease for Federal Income Tax pur-

poses and elect to have Lessor receive the benefits of ownership [IRC sec. 168(f)(8)].

18. The form requires Lessee to observe certain use restrictions, ¶ 18; and to permit inspection ¶ 23.

19. The form provides for "lease" for a fixed term of months; and for regular monthly payments consisting of "Fixed Monthly Rental Charges" plus "Sales or Use Tax." The initial payment may also include "Refundable Security Deposit," "Title, License and Registration Fees," "Sales, Excise or Use Tax (if required to be paid in advance)," "Trade-in Allowance," and "Capitalized Cost Reduction." Blanks are provided whereby specific numbers and amounts may be assigned to these categories.

20. The form also provides for something called "residual liability," a blank to be filled in with a number whose provenance is not disclosed; and for "unearned charges," figured by applying the "Rule of 78s" to another blank filled in with a number whose provenance is not disclosed. The "residual liability" is not, in any of these contracts, identical to the number to which the "Rule of 78s" is applied.

21. The contract provides an option to purchase, ¶ 10, and arrangements for early termination, ¶ 14.

22. If the option is exercised, with 30 days' notice, at the end of the fully scheduled term, the purchase price is "Fair Market Value"—not the actual value of the particular vehicle at that time, but an artificial value defined by the contract as "the average of the retail and wholesale values stated in a then current vehicle guidebook selected by Lessor," ¶ 10.

23. No provision of the contract unambiguously states what happens when the option to purchase is not exercised at the end of the fully scheduled term. ¶ 14(c)(ii) states what happens "[i]f the vehicle is not purchased by [Lessee] under the provisions of [¶] 10," but ¶ 14 as a whole is entitled *"Early Termination and Default."*

24. If the option is exercised before the end of the full scheduled term, the pur-chase price is the *greater of* "Fair Market Value" as described above *or* an amount calculated as follows: unmatured rent + residual value + fixed charges ($600 if terminated within 12 months, $400 if terminated within 13–24 months, $200 if terminated within 25–36 months)—unearned charges. ¶¶ 10, 14(c)(i).

25. If the lease is terminated early but the option to purchase is not exercised, Lessee is required to return the vehicle to Lessor, ¶ 20. Lessor is then required to sell it "at wholesale in a commercially reasonable manner," ¶ 14(c)(ii). Lessor then performs the calculation stated in the preceding paragraph, i.e., unmatured rent + past due rent + residual value + fixed charges—unearned charges; to the result Lessor now must "apply the greater of the amount of the net proceeds ... or the residual value ... If there is a balance due, [Lessee] agrees to pay it promptly. Any surplus will be kept by Lessor," ¶ 14(c)(ii).

26. Harvey's contract, dated September 17, 1985, concerning the 1985 Pontiac Trans Am, is not clearly legible. It appears to establish a term of 60 months; monthly payments of approximately $324.89 "rent" and $20.31 "sales or use tax;" an initial payment in indeterminate amount for "license," and a total payment over the full term of approximately $1,251 for "title, license and registration fees;" an initial payment also or $350 for "refundable security deposit;" "residual value" of $6,511.63; and application of the Rule of 78s to the amount of $6,646.13.

27. Vernon's contract, dated August 30, 1985, concerning the 1985 Oldsmobile "98" Regency Coupe, establishes a term of 60 months; monthly payments of $319.55 "rent" and $19.97 "sales or use tax;" initial payment of $350 for "refundable security deposit;" no initial or specified monthly payments for title, license or registration fees, yet a total amount of $1,110 to be paid in an unspecified manner over the entire term for "title, license and registration fees;" "residual value" of $5,549.40; and application of the Rule of 78s to the figure of $5,022.40.

28. Pollard's contract, dated July 30, 1985, concerning the 1985 Cadillac Eldorado, establishes a term of 36 months; monthly payments of $566.53 "rent" and $35.41 "sales or use tax;" initial payment of $10.00 for "certificate of title" and $285 for "license;" two more annual payments of $285 for "license and registration fees;" "residual value" of $12,768.00; and application of the Rule of 78s to the figure of $7,262.08. Also initial payment includes $896 for "sales, excise or use tax."

29. Attached to and included in the parties' stipulation are copies of the vehicles' Certificates of Title.

30. The certificate for Harvey's vehicle, the 1985 Pontiac Trans Am, lists "F.D. Price [$]11,5—.—" (the figure being mostly illegible) and T.D. Price [$]17,10–.—" (the figure being partly illegible).

31. The certificate for Vernon's vehicle, the 1985 Oldsmobile "98" Regency Coupe, lists "F.D. Price [$]16,271.00" and "T.D. Price [$]18,000.00".

32. The certificate for Pollard's vehicle, the 1985 Cadillac Eldorado, lists "F.D. Price [$]21,355.00" and [$]27,536.00."

33. Any conclusions of law which ought more properly to be findings of fact are incorporated herein by reference.

## CONCLUSIONS OF LAW

The issue is whether G.M.A.C. should be treated as owner of these vehicles, who merely parted with possession of them pursuant to leases and is entitled to recover them from Trustee, or as a creditor who sold the vehicles to debtors, subject to security interests which have not been perfected and are therefore inferior to the Trustee's interest. This in turn depends on whether the written agreements which purport to be leases were "intended to create a security interest," 12A O.S.A. § 9–102(1)(a). The general nature of an inquiry into intent to create a security interest was summarized by this Court in *In re Breece*, 58 B.R. 379, 382–383 (B.C., N.D. Okla.1986), which said decision is again reaffirmed by this Court.

### A—Purchase Option

■ One, but not the only, test to determine whether a transaction is a sale is whether or not the lease has a provision allowing the lessee to become the full owner by exercising an option for nominal consideration. This is only one of several tests to be used to determine the legal effect of the transaction between the parties.

■ A transaction purporting to be a lease will be deemed a secured sale if "a purchase option exists and it or other items in the "lease" permit the "lessee" to become full owner by merely paying no or nominal consideration after complying with its terms," *In re Breece*, supra., quoting *In re Fashion Optical, Ltd.*, 653 F.2d 1385, 1388 (10th Circ.1981).

■ The form of agreement herein contains a purchase option. The question is whether such option permits the lessee to buy the vehicle for "no or nominal consideration."

"The percentage that option purchase price bears to the list price, especially if it is less than 25% is to be considered as showing the intent of the parties to make a lease as security," *In re Fashion Optical, Ltd.*, supra., at 1389, "*Percival Construction Co., v. Miller & Miller Auctioneers, Inc.*, 387 F.Supp. 882, 885 (W.D.Okla.1973), aff'd 532 F.2d at 171–172.

Here the parties have not stipulated to any "list price." The Court might infer some approximation of "list price" from the "F.D. Price" and "T.D. Price" stated on the certificates of title. But even then, the parties have not stipulated to any information from which the purchase option price, which depends on book value at the time the option is exercised, can be calculated. The Court is unable to determine any percentage, and cannot apply the above-mentioned test.

■ Option purchase price may be "nominal" regardless of any percentage to list price, "[w]here the terms of the lease and option to purchase are such that the only sensible course for the lessee at the end of the lease term is to exercise the option and become the owner of the goods," *In re*

**538**

*Fashion Optical, Ltd.,* supra., *"Percival Construction Co., v. Miller & Miller Auctioneers, Inc.,* supra.

Here, lessee might buy the vehicle at the end of the lease term for a sum based on book values, which cannot be determined under this evidence but might well be substantial, especially in the case of a relatively short lease, e.g. the Pollard lease for only 36 months. Lessee might well decline to exercise so expensive an option, and "walk away" from the deal exposing himself only to the penalty and to deficiency amounts as calculated by the provisions of the agreement. The Court cannot say that "the only sensible course for the lessee ... is to exercise the option and become the owner of the goods."

The Court concludes that the plaintiff Trustee has failed to show that the option purchase price is nominal.

**B—Economic Realities**

 "If the option does require greater than nominal consideration for full ownership, a true lease is usually found," *In re Fashion Optical, Ltd.,* supra. Here, the Court has been unable to determine whether the leases require greater than nominal consideration for full ownership. This prevents finding that these agreements were intended as security; it also prevents finding that these agreements are true leases. And in any event, a purchase option for greater than nominal consideration "usually" but *not* invariably, indicates a true lease. "Thus, even though nothing in the 'lease' may permit purchase at nominal consideration, the 'lease' will still be deemed one intended as security if the facts otherwise expose economically realities tending to confirm that a secured transfer of ownership is afoot," *In re Fashion Optical, Ltd.,* supra, citing *In re Tulsa Port Warehouse Co.,* 4 B.R. 801, 29 U.C.C.R. 1608, 1612–1613 (N.D.Okla.1980), aff'd 690 F.2d 809 (10th Cir.1982). This Court reviewed and analyzed the *In re Tulsa Port Warehouse Co.* doctrine at length in *In re Breece,* supra. Those principles must now be applied herein. In those cases, secured transfers of ownership were established by: (1) the concentration of all incidents of

ownership of the vehicles, save bare legal title, in lessee; or (2) the effect of termination provisions, which removed any reversionary interest from lessor and established an equity in the vehicles in lessee; or (3) economic equivalence of the transactions with secured sales.

**(1)—Concentration of Incidents of Ownership in Lessee.**

The *Tulsa Port* lease form provided that title to each vehicle remained in lessor. However, lessee was required to assume all expenses for maintenance and repair, fees and liabilities for operation, and risk of loss; and to pay sales tax. "As a practical matter, the lessee [held] all the incidents of ownership except bare legal title," *In re Breece,* supra, p. 384, quoting *In re Tulsa Port Warehouse Co.,* supra, 690 F.2d p. 812. With regard to expenses for maintenance and repair, fees and liabilities for operation, and payment of sales or use tax, the lease form in the present cases is similar to the lease form in *Tulsa Port.*

**(2)—Effect of Termination Provisions.**

This lease compels the lessor to sell his own property. This concept of extinguishment of the ownership rights of the lessor upon termination (whether or not the lessee exercises his option rights) is repugnant to the lessor's true ownership rights. An examination of ¶ 14(c)(ii) of the agreement requires the vehicle to be sold for the purpose of establishing the deficiency owed by the lessee and so as to assure the lessor the value of the vehicle plus accrued interest and penalties. This Court is hard pressed to imagine a true lease where the lessor is required to sell his property upon the termination of the lease.

**(3)—Economic Equivalence of the Transactions with Secured Sales.**

A scrutiny of the termination provisions reveal that the lessor will recoup from the lessee the totality of the benefit of the bargain as if this transaction were a sale. The formula set forth in ¶ 14 of these lease provisions is convoluted and complicated so as to secrete the fact that the lessor receives the same monetary benefit as if this transaction were a loan of money secured

by a security interest in the motor vehicle. The termination provisions call for a calculation to determine the outstanding unpaid balance on said lease payments and add thereto the value of the vehicle at the time of completion of the lease and subtract therefrom unearned charges according to the Rule of 78s and add thereto early termination payments. [Inserting numbers into this formula reveals that no entity should terminate under those conditions, and accordingly, option purchase (only available at the time of the completion of the lease) is not practical and thus the second part of ¶ 14 becomes operative at which time the security involved must be sold and a formula to determine the net proceeds is set forth (which ignores commercial standards of the Uniform Commercial Code of the state of Oklahoma) which said formula causes gyrations effectively depreciating any equity interest which may or might be afforded the lessee.] The result of these manipulations is to assure the lessor repayment of the purchase price of the vehicle, plus a reasonable amount for the deterrence of the same, whether the same be paid to the lessor in monthly installments or whether the same be paid to the lessor (with penalties) at time of termination. In reality this gives the "lessor" the return of his capital, plus interest, in any scenario covered by the contract.

The Court is not impressed with the manipulations of parties to seek advantage of various and sundry tax laws which said manipulations do harm to commercial transactions and the rights of purchasers as contemplated by businessmen who created the Uniform Commercial Code; much less what these transactions do to the protection of consumer in regard to disclosure of the true transaction. Again, if one reserves the right to observe the totality of the agreement itself, one may only come to the conclusion that the substance of this transaction is, in fact, a sale. This Court views true leases as agreements between parties wherein the party pays for the possession and use of a particular item for a sum certain and at the termination of said lease the particular item is returned to the owner thereof at which time the owner then leases said item to another party. To require the item to be sold at the time of the termination of the lease is substantial evidence that the value of the particular item at termination is necessary to enable the owner of the item to recoup its value plus a reasonable cost for the deterrence of the same which is, in fact, a sale. Requiring this vehicle to be sold is substantial evidence of the fact that this transaction is a sale in the first instance. This Court is not impressed with the difficulty of determination of the rights and duties of the lessor which in fact afford the lessor the sale price of the particular item involved, 12A O.S.A. § 1–103; 15 O.S.A. § 170; *Sac City Canning Co. v. Griffin Grocery Co.*, 99 Okl. 99, 225 P. 702 (1924).

This Court is not impressed with the fact that the title to the motor vehicle is in the name of the lessor, for title to personalty is not paramount to ownership but only evidence of the same.

It is of paramount importance that the benefit to a purchaser in leasing this vehicle as compared with purchasing the same is the fact that the "lease" payments as well as other expenses allied thereto are tax deductible [, in toto, from a tax aspect viewpoint]; while a purchaser who acquires a car by a loan and security agreement is required to depreciate said motor vehicle for tax purposes and treat the same as it really is, a capital item.

Suffice to say other incidents of ownership such as maintenance charges, license fees, taxes, repairs, insurance, both casualty and comprehensive, risk of loss, default provisions governing acceleration and resale, the ability of the lessee to select and have ordered the vehicle meeting the lessor's specific specifications, rental payments being equivalent to the costs of goods plus interest, less the residual value of the goods, indicate this transaction to be a sale.

Under these facts the defendant is a creditor holding an unperfected secured claim in the estate and the interest of the defendant in these vehicles is inferior to that of the plaintiff Trustee by virtue of 11 U.S.C. § 544.

Accordingly, the Court finds for the plaintiff and against the defendant: that said lease constitutes a disguised sale and the agreement creates a security interest in the vehicle, which is unperfected and is subordinate and inferior to the right, title and interest of the plaintiff herein; and by virtue of the stipulation between the parties plaintiff shall be allowed to retain the proceeds from the sale of the vehicle for the benefit of this estate. The defendant creditor shall be allowed an unsecured claim in the amount filed. Judgment shall be entered in accordance with this memorandum of opinion.

AND IT IS SO ORDERED.