U.S.C. § 502(g) insofar as not duplicative of GATX's other claim(s).

AND IT IS SO ORDERED.

In re OTASCO, INC., Debtor.

WHEELS, INC., Plaintiff,

v.

OTASCO, INC., a Nevada corporation, Defendant.

Bankruptcy No. 88–03410–W.
Adv. No. 89–0204–W.

United States Bankruptcy Court,
N.D. Oklahoma.

March 27, 1990.

See also, Bkrtcy., 110 B.R. 964.

Brian J. Rayment, Joyce and Pollard, Tulsa, Okl., for plaintiff; Kevin T. Keating and James D. Harrington, McDermott, Will & Emery, Chicago, Ill., of counsel.

Sam Bratton, II, Doerner, Stuart, Saunders, Daniel & Anderson, Tulsa, Okl., for defendant.

## MEMORANDUM DECISION AND ORDER

MICKEY DAN WILSON, Bankruptcy Judge.

Wheels, Inc. brought an adversary proceeding for declaratory judgment against Otasco, Inc. to determine priority of conflicting interests in certain motor vehicles or their proceeds. The issue is whether a written agreement concerning these vehicles and purporting to be a lease, should be treated as an unperfected security agreement. The matter has been submitted for decision on stipulations, briefs and oral argument. Upon consideration thereof, the Court finds, concludes and orders as follows.

## FINDINGS OF FACT

Wheels, Inc. ("Wheels") "is an Illinois corporation with its principal place of business in Des Plaines, Illinois. Wheels is in the business of leasing automobiles to businesses," Pre-trial Order p. 2, ¶ II(1).

Otasco, Inc. ("Otasco") "is a Nevada corporation with its principal place of business in Tulsa, Oklahoma. Otasco is in the business of retail sales of tires, accessories, and other goods," Pre-trial Order p. 2, ¶ II(2).

"On February 2, 1984, Wheels entered into an agreement with Otasco (the 'Agreement'), which governed the terms under which Otasco, from time to time, would obtain motor vehicles from Wheels," Pre-trial Order p. 3, ¶ II(6). A copy of the Agreement is admitted as exhibit 1 appended to the pre-trial order.

The Agreement is designated "Lease" and identifies Wheels as "Lessor" and Otasco as "Lessee." ¶ 14 of the "Lease" is entitled "Ownership" and recites in pertinent part as follows: "It is expressly agreed that the Lessee by virtue of this lease acquires no ownership, title, property, right, interest, (or any option therefor) in any leased motor vehicle save as herein provided...."

The Agreement provides that "Lessee hereby leases one motor vehicle for delivery as specified by Lessee and other motor vehicles as may hereafter be ordered by Lessee ... with the Lessee to have possession and right to use said motor vehicles ...," Agreement ¶ 1, subject to minimal use restrictions, Agreement ¶ 4. The Agreement imposes all burdens and expenses of licensing, registration, taxes, fees, fines and penalties, maintenance and replacement, insurance, and liability for use in connection with the operation of leased vehicles on the Lessee, ¶¶ 4, 5, 7, 8, 11. Lessee may mark the vehicles with its own insignia, Agreement ¶ 9. The Agreement imposes no duties on Lessor except delivery of each vehicle at the inception of the lease, and acceptance, disposition and accounting of and for each vehicle at termination of the lease, as discussed below.

The Agreement provides that "[e]ach motor vehicle shall be leased for an initial term of 12 months from the date of the delivery of such vehicle to Lessee and thereafter for successive 12 month renewal terms; provided that Lessee shall have the right to cancel any vehicle at any time after the end of the first 12 months of the initial lease term for such vehicle by giving written notice of such cancellation to the Lessor ...," Agreement ¶ 12. No provision in the Agreement permits the Lessor to cancel once a vehicle has been leased; but "[e]ither Lessee or Lessor may terminate the obligation to lease additional or replacement vehicles at any time upon written notice to the other party," Agreement ¶ 12. The parties expected continuation beyond the initial 12–month term (as admitted in oral argument). There is no express limit to the possible number of "successive 12 month renewal terms," Agreement ¶ 12; nor is there any express option to purchase at any particular time.

The Agreement provides that "The monthly rental for each motor vehicle shall

be computed on the basis of the rider hereto attached marked 'Rental Schedule' and made a part hereof, and is intended to include the Reserve accrued for the estimated depreciation of the leased vehicle," Agreement ¶ 2. The "Rental Schedule" reads in its entirety as follows:

### RENTAL SCHEDULE

(Rider attached to and made a part of this lease.)

The monthly payment for each vehicle shall be computed as follows:

RENTAL

The rental shall be computed on the stipulated cost of the vehicle at the rates shown below for the period of rental indicated:

| | |
|---|---|
| 1st–12th Month | 2.9928% |
| 13th–24th Month | 2.7428% |
| 25th–36th Month | 2.4629% |
| 37th–48th Month | 2.2329% |
| 49th–50th Month | 2.0987% |

Provided, however, that at no time will the rental be less than a minimum of $3.00 per month.

AMORTIZATION ACCOUNT:

2.00% per month of the stipulated cost of each vehicle for the duration of the contract for such vehicle or until a total of 100% of the stipulated cost shall have been paid, whichever occurs first.

It is anticipated that at the end of the maximum term herein prescribed, the vehicle will have only scrap value and if for any reason the Lessee desires to continue to operate the vehicle the Lessee agrees to pay to the Lessor a monthly rental of $3.00 during such extended period.

The rental hereinabove specified may be changed on notice from the Lessor to the Lessee but only as it affects vehicles delivered after the effective date of change cited in said notice.

The Agreement further provides as follows:

3. **LESSEE ACCOUNT.** The Lessor, upon receipt of a leased motor vehicle from the Lessee after the termination of the lease of said motor vehicle, will proceed to sell said motor vehicle at wholesale on the best terms available for cash, in the discretion of the Lessor (the net amount received from the sale of the motor vehicle to the Lessor to the final completion of the sale thereof being called the "Net Proceeds"). If the Net Proceeds plus the amount accrued for the Reserve for said motor vehicle (the "Total Recovery") is in excess of the "stipulated cost" of the motor vehicle, then the amount of such excess shall be promptly credited to the Lessee by the Lessor. If the Total Recovery is less than the "stipulated cost" of the motor vehicle, then the Lessee shall promptly pay such deficiency to the Lessor; provided that in the event of any such sale the Lessor shall guaranty to Lessee that the Net Proceeds shall at least equal (a) the following percentages of the fair value of the vehicle as of the beginning of the 12 month period during which the date of termination occurs:

| Period | Percentage |
|---|---|
| Initial 12 month period of lease | 20% |
| Each subsequent 12 month period | 30% |

less, in any case, (b) the amount of any loss or damage to be insured or borne by Lessee under Section 5 or 11 hereof. As an alternate to sale of the vehicle by the Lessor, the Lessee may, at its option, on 30 days written notice to the Lessor, arrange for the sale of the vehicle for the account of the Lessee (but not to the Lessee), without the services of the Lessor, providing payment is first made to the Lessor by or on behalf of the Lessee of the remaining book balance for said vehicle, and any charges accrued to the Lessor on said vehicle to said date.

It is stipulated that "The 'amount accrued for the Reserve of said motor vehicle' referred to in Paragraph 3 of the Agreement is calculated on the Rental Schedule under the heading 'Amortization Account,'" Pre-trial Order p. 5, ¶ II(11).

The "stipulated cost" referred to above is not expressly defined anywhere in the agreement. However, the Agreement provides that "[a]t the beginning of each

month, the Lessor shall render a monthly invoice to the Lessee for all payments due to the Lessor for all motor vehicles theretofore delivered to the Lessee, and the Lessee agrees to make prompt payment thereof. The Lessor will also render to the Lessee details of the 'stipulated cost' together with the term of the lease thereof, the rental rate and charges of all motor vehicles delivered to the Lessee," Agreement ¶ 2.

At the end of the lease term, "the Lessor will render efficient service in sale or disposal of the leased motor vehicle to obtain the largest net return for the Lessee," Agreement ¶ 6.

On November 6, 1988, Otasco filed its petition for relief under 11 U.S.C. Chapter 11. "Otasco is operating its business and remains in possession of its property as debtor and debtor in possession," Pre-trial Order p. 2, ¶ II(3).

On July 11, 1989, Wheels filed its complaint herein seeking declaratory judgment that the Agreement is a true lease which Otasco must assume or reject; or, in the alternative, that Wheels has a perfected security interest in the "leased" vehicles. Otasco answered, and asserts that the Agreement is not a true lease, is intended as security, and that Wheels' security interest has not been perfected.

The matter was set for trial on December 11, 1989. However, on that date, the parties filed their "Agreed Pre–Trial Order," reciting stipulated facts, stating that "no other facts are in dispute" and no further evidence would be offered, and announcing that "[t]he parties intend to file cross-motions for summary judgment on the legal issues involved," Pre-trial Order p. 7, ¶ IV. The Court thereupon ordered that briefs, if any, must be filed on or before December 18, 1989, and scheduled oral argument for December 19, 1989.

"As of the date of th[e] Pre–Trial Order, Otasco had in its possession 21 motor vehicles which it obtained from Wheels. These 21 motor vehicles and the States of origin of their respective certificates of title "as are follows:

| Vehicle I.D. # | Year | Make | State of Title |
|---|---|---|---|
| 2G2AF19X1G9274515 | 1986 | Pontiac | Oklahoma |
| 1G2AF19X3GT246689 | 1986 | Pontiac | Oklahoma |
| 1G2AF19X1GT248053 | 1986 | Pontiac | Oklahoma |
| 2G2AF19XXG9273797 | 1986 | Pontiac | Oklahoma |
| 1G2AF19X0GT246343 | 1986 | Pontiac | Georgia |
| 2B4FK41G7GR798422 | 1986 | Dodge | Oklahoma |
| 2G2AF19XOG9274778 | 1986 | Pontiac | Oklahoma |
| 1G2AF51W1HT275488 | 1987 | Pontiac | Tennessee |
| 1G2AF51W8HT279621 | 1987 | Pontiac | Louisiana |
| 3G1AW51W9JS509008 | 1988 | Chevrolet | Kansas |
| 2B4FK4133JR580322 | 1988 | Dodge | Tennessee |
| 1GCER14GHS110304 | 1987 | Chevrolet | Oklahoma |
| 2G2AF51W1H9265373 | 1987 | Pontiac | Arkansas |
| 2G2AF51WXH9248796 | 1987 | Pontiac | Georgia |
| 1G2AG51WXHT283909 | 1987 | Pontiac | Texas |
| 1G2AF51W3JT254356 | 1988 | Pontiac | Georgia |
| 1G2AF51W3JT254390 | 1988 | Pontiac | Kansas |
| 1G2AF51W1JT254372 | 1988 | Pontiac | Oklahoma |
| 1G2AF51W1JT254386 | 1988 | Pontiac | Louisiana |
| 2B4FK4131JR750886 | 1988 | Dodge | Oklahoma |
| 2B4FK4134JR748470 | 1988 | Dodge | Oklahoma |

Pre–Trial Order, pp. 3–4 ¶ II(7). "All of the vehicle titles list Wheels as the owner, but the titles do not list Wheels as a lienholder," Pre–Trial Order, p. 4 ¶ II(8). So far as appears from the record, no lien entry forms were ever delivered to the Oklahoma Tax Commission, pursuant to 47 O.S. § 1110, as to any of the vehicles herein.

Some of these vehicles have been or are to be sold, and the proceeds escrowed;

Otasco is making scheduled payments on the rest, Pre–Trial Order pp. 4–5, ¶ II(9), (10).

On December 14, 1989, Wheels filed its Trial Brief. Otasco filed no brief. On December 19, 1989, at oral argument, counsel for Otasco stated that he was unaware that Wheels had filed its brief, and that in order to conserve estate funds he had chosen to rely on oral argument. After oral argument, counsel for Otasco waived any further opportunity to file his brief. The oral argument was no mere ritual exercise, but served as an effective supplement to the written record.

Any "Conclusions of Law" which ought more properly to be "Findings of Fact" are adopted and incorporated herein by reference.

## CONCLUSIONS OF LAW

This is a core proceeding under 28 U.S.C. § 157(b)(2)(K), (0), 11 U.S.C. § 541(a)(1), § 544(a).

### I WHETHER LEASE IS INTENDED AS SECURITY

Wheels seeks declaratory judgment that certain vehicles were leased by Wheels to Otasco, and are therefore owned by Wheels as lessor and are not part of Otasco's bankruptcy estate under 11 U.S.C. § 541(a)(1). Otasco argues that the purported "lease" should be treated as a secured sale, and therefore the vehicles are owned by Otasco and are property of Otasco's bankruptcy estate, subject to Wheels' security interest. Further, that said security interest is unperfected and inferior to Otasco's interest pursuant to 11 U.S.C. § 544(a), § 1107(a). Otasco's position depends upon the combined effect of 11 U.S.C. § 541(a)(1), which gives Otasco's bankruptcy estate certain ownership rights as successor in interest to *the debtor,* and § 544(a), which gives Otasco's bankruptcy estate certain priority rights enjoyed by a particular class *of creditor* as against other, lesser creditors. But as a first step, it must be determined whether Otasco has any ownership rights, and whether Wheels should be treated as a mere creditor. Resolution of this issue in turn requires interpretation and evaluation of the parties' "lease" Agreement.

The Agreement provides that it shall be interpreted according to the laws of the State of Illinois. Wheels is an Illinois corporation; but Otasco is an Oklahoma corporation, most of the vehicles are titled in Oklahoma, and this Court sits in Oklahoma. Wheels asserts that this Court, as a Federal court sitting in Oklahoma, must apply the choice of law rules of the state of Oklahoma; that Oklahoma courts use the Restatement 2nd rules for choice of law; and that under those rules, the parties' choice of law governs, unless there is no reasonable connection between their choice and the forum State or some fundamental policy of the forum State would be infringed.

Wheels' assumption that this Court must automatically apply Oklahoma's choice of law rules is not well founded. Although Wheels' assertion might be well taken in a Federal diversity case, this is not a diversity case.

In cases where items of property are scattered through several states, or where legal relations governed by varying state laws are affected by the trustee's status under the section 544(a), problems of the conflict of laws are certain to arise. Although some courts have appeared to think that a bankruptcy court is obliged to apply the conflict-of-laws rules of the state of the forum, the more supportable view is that the bankruptcy court should be free to exercise for itself the choice of applicable state law. In any event, the tendency of the courts is to treat the law of the situs of property at the commencement of the case as governing to the extent that section 544(a) refers to non-bankruptcy law,

4 *Collier on Bankruptcy* (15th ed. 1989) ¶ 544.02 pp. 544–13, 544–14. The whereabouts of all of these vehicles at the commencement of this case is not shown. The situs of chattels subject to documents of title is debatable.

However, if the Court does not automatically adopt Oklahoma's choice-of-law rules, the Court must determine whose choice-of-

law rules it should adopt, or must fashion its own as a matter of Federal bankruptcy case law. Here, Otasco does not argue the point; and the Court sees no particular reason why the parties' choice of law should *not* govern. The applicable substantive law will be Uniform Commercial Code Sections 1–201(37) and 9–102(1)(a), enacted in identical form in both Illinois and Oklahoma (until recent amendment of § 1–201(37) in Oklahoma, see below), concerning "leases" intended as security, a subject on which there are no published opinions of the Supreme Courts of either Illinois or Oklahoma. Wheels offers a decision by a Bankruptcy Court sitting in Illinois, *In re Loop Hospital Partnership*, 35 B.R. 929 (B.C.N.D.Ill.1983), but cites no authority which would make this decision binding on this Court. The court in *In re Loop Hospital Partnership*, cites, among other non-Illinois authorities, an opinion from this District, *In re Tulsa Port Warehouse Co., Inc.*, 4 B.R. 801 (D.Ct.N.D.Okla. 1980) *aff'd*, 690 F.2d 809 (10th Cir.1982), and the Court of Appeals of this Circuit, *U.S. for Eddies Sales and Leasing, Inc. v. Federal Insurance Co.*, 634 F.2d 1050 (10th Cir.1980). This Court, the District Court of this District, and the Court of Appeals of this Circuit, have developed considerable case law on the subject of leases vs. security agreements under Oklahoma's pre–1988 version of Uniform Commercial Code § 1–201(37). Under these circumstances, this Court will therefore proceed to interpret and analyze this "lease" Agreement under the law of the State of Illinois, but construing Illinois statutes with reference to comparable statutes in other States and case law thereunder.

Effective November 1, 1988, the State of Oklahoma amended its version of Uniform Commercial Code § 1–201(37), in conjunction with Oklahoma's enactment of Uniform Commercial Code Article 2A. The amendments themselves are said to "clarify" prior law, and to that extent might be read back into prior transactions, as was done in *In re Cole: Woodson v. Ford Motor Credit Co.*, 100 B.R. 561 (B.C.N.D. Okla.1989). Wheels urges this Court to follow *In re Cole*, and interpret the lease

Agreement herein in light of Oklahoma's new amended version of Uniform Commercial Code § 1–201(37). Even though the amendments purport to "clarify" the prior Uniform Commercial Code *text*, they certainly are meant to alter some caselaw interpreting and applying that prior text. To that extent these amendments do change prior *law*. For that reason, this Court has already refused to read these amendments back into prior leases even under Oklahoma law, *In re Thompson*, 101 B.R. 658 (B.C.N.D.Okla.1989). This Court certainly will not attempt to interpret an Illinois statute in light of a later Oklahoma statute which has not been enacted in Illinois. This Court will confine itself to that version of the Uniform Commercial Code existing in Illinois, its counterpart in other States, and caselaw thereunder.

The general nature of an inquiry into whether a purported lease should be treated as a secured transaction was explained at length in *In re Breece*, 58 B.R. 379, 382–383 (B.C.N.D.Okla.1986) and summarized in *In re Harvey*, 80 B.R. 533, 537 (B.C.N.D.Okla.1987), and need not be repeated here.

However, a summary review of this Agreement's provisions and operation (as set forth in more detail in the "Findings of Fact" above) is appropriate.

The Agreement herein has a 12–month "initial" term, renewable thereafter every 12 months, apparently without limit unless the lessee cancels (although the lessor may refuse to provide any further new or replacement vehicles). It was admitted at oral argument that the parties expected continuation beyond the initial 12–month term. The rental and amortization schedules appended to the Agreement indicate that the parties contemplated a normal term of 50 months. During this term, for all practical purposes the lessee would treat the "leased" vehicles as its own.

At termination, whether after the initial 12 months, or after any subsequent 12–month period, or after 50 months, or at any other time, the "leased" vehicle must be sold, by either lessor or lessee. The sale proceeds are added to the "Reserve," and

the total is credited against "stipulated costs." Neither "Reserve" nor "stipulated cost" are clearly defined in the Agreement; but "stipulated cost" appears to be arbitrarily fixed by the lessor, and the "Reserve" accrues as a percentage of "stipulated cost" which over 50 months would equal 100% of "stipulated cost." If the sale proceeds plus Reserve exceed stipulated cost, the excess is credited to the lessee. If the sale proceeds plus Reserve are less than stipulated cost, the deficiency must be paid by the lessee. Accordingly, the express purpose of the sale is "to obtain the largest net return for the Lessee," Agreement paragraph 6.

After "maximum term," also not defined but bearing some relationship to the 50-month maximum rent and amortization periods, "[i]t is anticipated that ... the vehicle will have only scrap value" and the lessee has an option: lessee may allow the vehicle to be sold as described above, or the lessee may "continue to operate the vehicle" for "a monthly rental of $3.00 during such extended period."

The rent paid during the 50-month term is based on the stipulated cost of each vehicle. Over 50 months, the rent would total 129.3742% of stipulated cost.

■ A transaction purporting to be a lease will be deemed a secured transaction if "a purchase option exists and it or other items in the 'lease' permit the 'lessee' to become full owner by merely paying no or nominal consideration after complying with its terms," *In re Fashion Optical, Ltd.: Steele v. Gebetsberger*, 653 F.2d 1385, 1388 (10th Cir.1981).

■ This Agreement contains no express purchase option. Otasco argues that there is an "implied" or disguised purchase option, in that: (1) lessee may terminate at any time, upon termination the vehicle must be sold, and nothing in the Agreement prohibits lessee from buying the vehicle itself; and (2) after 50 months, lessee can keep a vehicle indefinitely for only $3.00 per month, or can then have the vehicle sold and pocket *all* of the sale proceeds. Otasco points out that the lessee must be entitled to all of the sale proceeds,

because the rental and amortization schedules ensure that the stipulated cost is entirely paid off after 50 months, so there is nothing against which sale proceeds must be offset. This appears to be a correct reading of the Agreement. Therefore, this Agreement does contain a purchase option, despite the draftsman's efforts to conceal the same. The question is whether such purchase option permits the lessee to buy the vehicle for "no or nominal consideration."

"The percentage that [the] option purchase price bears to the list price, especially if it is less than 25%, is to be considered as showing the intent of the parties to make a lease as security," *In re Fashion Optical, Ltd.*, 653 F.2d at 1389.

The Agreement itself posits that, after 50 months, the vehicle will have only scrap value. The actual list price of vehicles does not appear, nor do any estimates in dollars of their scrap value. It seems highly probable that any motor vehicle's scrap value must be far less than its list price when the vehicle is new—far less even than 25% of list price. Therefore, this purchase option price would be for "nominal consideration." Unfortunately, such prices and values are not in evidence. Under the circumstances, the Court has no choice but to continue its inquiry.

Option purchase price may be "nominal" regardless of any percentage to list price, "[w]here the terms of the lease and option to purchase are such that the only sensible course for the lessee at the end of the lease term is to exercise the option and become the owner of the goods," *In re Fashion Optical, Ltd.*, 653 F.2d at 1389.

Here, after 50 months lessee can either sell the car to another and pocket the proceeds, buy the vehicle, or continue to use the vehicle for "rent" of $3.00 per month. Rather than accumulate a fleet of old, worn-out cars, Otasco is very likely to sell the vehicles to others and pocket the proceeds. The Lessee therefore might well refuse to exercise its option to become the owner of the goods themselves. The Court cannot say that "the only sensible course

for the lessee ... is to exercise the option and become the owner of the goods."

The Court strongly suspects that the option purchase price is "nominal" yet the Court must conclude that Otasco has failed to demonstrate the point by admitted evidence.

In *In re Loop Hospital Partnership*, it is said that "It is this court's opinion that the express or implied option plus a nominal fair market value are both necessary to create a security interest," *Loop Hospital*, 35 B.R. at 934. That statement appears to be dictum, and is not followed by this Court, since it unduly restricts the fact-specific inquiry called for by U.C.C. § 1–201(37) and is contrary to other authorities cited immediately below. In any event, the *Loop Hospital* case is distinguishable, as is discussed in due course below.

"If the option does require greater than nominal consideration for full ownership, a true lease is usually found," *In re Fashion Optical, Ltd.*, 653 F.2d at 1389. However, "usually" does not mean invariably. "Thus, even though nothing in the 'lease' may permit purchase at nominal consideration, the 'lease' will still be deemed one intended as security if the facts otherwise expose economic realities tending to confirm that a secured transfer of ownership is afoot," *id.*, citing *In re Tulsa Port Warehouse Co.*, 4 B.R. 801, (N.D.Okla. 1980) *aff'd*, 690 F.2d 809 (10th Cir.1982). This Court reviewed and analyzed the *Tulsa Port* doctrine at length in *In re Breece*, *supra*, and applied it in *In re Harvey*, *supra*, and recently in *In re Thompson*, *supra*. Those principles must now be applied herein. In those cases, secured transactions were shown by: (1) the concentration of all incidents of ownership of the vehicles, save bear legal title, in lessee; (2) the effect of termination provisions, which established an equity in the vehicles in lessee and removed any reversionary interest from lessor; (3) economic equivalence of the transactions with secured sales or loans.

Here, "[a]s a practical matter, the lessee [holds] all the incidence of ownership ex-

cept bear legal title," *In re Breece*, 58 B.R. at 387 (quoting *Tulsa Port*, 690 F.2d at 812). In this respect, the Agreement herein is equivalent to a secured transaction.

Here, the termination provisions are of an "open-end" type in which the vehicle must be sold, the sale proceeds are credited against lessee's monetary obligation, any excess is credited to lessee, and any deficiency is made up by lessee. Thus, the lessee bears the risk of loss or the expectation of gain upon disposition of each vehicle. Such provisions indicate an equity in the lessee, and therefore a lease intended as security, *In re Breece*, *supra*, and *In re Tulsa Port*, *supra*.

Here, where the vehicle must be sold, and the sale is essentially for the benefit of the lessee, there is no true lease-like reversion in the lessor. From the outset of the "lease," the lessor gives up any expectation of recovering the vehicles themselves, and any expectation of recovering their value beyond a set amount. Upon sale, of course, the lessor will cease to hold even bare legal title to the vehicle. "It is indeed a curious 'lease' whose termination, rather than restoring full ownership to the lessor, *extinguishes* whatever ownership had remained in the lessor during the lease term," *In re Breece*, 58 B.R. at 385 n. 4. In this respect also, the termination provisions of this Agreement indicate a lease intended as security.

"The final test is whether the transactions are economically equivalent with secured sales or loans—if so, they are to be treated as such. This test calls for evaluation of the real-world operation of these leases, including all the factors discussed so far, considered not separately but in combination ...," *In re Thompson*, *supra*.

Despite lack of actual sale prices and such dollar amounts in evidence, and despite the apparently calculated obscurity of lease terms such as "reserve" and "stipulated cost," the economic effect of this Agreement can be inferred from the contractual provisions themselves. Lessor will get "stipulated cost" plus 29.3742% over 50 months—the same amounts even if the lease term ends earlier than 50 months—

and the right to take back the car, sell it, and deduct those amounts if the lessee does not pay. Lessor irrevocably gives up any other rights in the vehicle at the inception of the "lease" and cannot take the vehicle back unless the lessee defaults. The lessee gets a vehicle which he can treat as his own, and either keep as long as he likes or sell when he likes, provided he pays the lessor the pre-determined cost plus 29.3742%, either by installment or from sale proceeds or by paying off the balance in a "balloon" payment at term end. Such an arrangement is indistinguishable from a secured sale.

In *In re Loop Hospital Partnership, supra,* the court held that a lease of hospital equipment was a true lease because there was no option to purchase (not even an implied option), the lease term apparently ended after only five years, there was no evidence to indicate that the property's useful life was exhausted or that the parties intended any continuation of the lease, lessee was required to return the property to lessor, and there was no evidence to indicate that the property or its value would in any manner be retained by the lessee. That case is clearly distinguishable on its facts from the situation herein.

The Court concludes that this Agreement is not a true lease but is intended as security. As such, it must be treated as a secured transaction. Lessor's interest in this vehicle is not an ownership interest but a security interest.

This discussion may be closed, and the next subject introduced, with this observation:

> It is a bit mystifying that drafters continue to churn out such sham leases—apparently even fooling themselves into believing they need not file—especially since unrelated benefits of the lease characterization, such as tax benefits, have largely disappeared,

James A. Martin, "Secured Transactions," 19 Wayne Law Review 598, 611–612 (1973); and see *In re Thompson,* 101 B.R. 658, 675 (B.C.N.D.Okla.1989).

## II  WHETHER THE SECURITY INTEREST IS PERFECTED

Wheels proposes that, "[e]ven assuming that the lease is one intended for security, the listing of Wheels as owner on the certificates of title is sufficient to perfect Wheels' security interest," for the reason that: "Wheels's [sic] denomination as owner on the motor vehicles' Certificates of Title puts third parties on notice of Wheels' interest. As a result, Wheels has substantially complied with the procedure for perfection of a security interest under Oklahoma law," Wheels' brief p. 14.

In this Chapter 11 case, Otasco is a debtor-in-possession, 11 U.S.C. § 1101(1); there is no trustee. However, the debtor-in-possession's powers are derived from those of a trustee, 11 U.S.C. § 1107(a). In the following discussion, reference to "the trustee" includes the debtor-in-possession.

Where a "lease" is intended as security, the "lessee" has in fact bought the chattel and is the true owner of it. When the "lessee" enters bankruptcy, his ownership interest in the chattel becomes property of his bankruptcy estate, 11 U.S.C. § 541(a)(1). This interest, in turn, is legally managed and represented by the estate's trustee (or debtor-in-possession), 11 U.S.C. § 323, § 1107(a)—in effect, his ownership interest is inherited by his bankruptcy trustee. The trustee's basic duty is to allocate the Debtor's assets among the Debtor's creditors. This proceeding is analogous to an equity receivership and is inherently equitable in nature. As a rule, "equality is equity," and the ideal rule of distribution of assets in satisfaction of prepetition claims is that all creditors are given equal (i.e., *pro rata* ) shares of the available assets or their proceeds, 3 (Pt. 2) *Collier on Bankruptcy* ¶ 60.01, 743 (14th ed. 1978); 4B *Collier on Bankruptcy* ¶ 70.45, 557–558 (14th ed. 1978); Report of the Commission on the Bankruptcy Laws of the United States, July 1973, Pt. 1 p. 213–218; H.R.Rep. No. 95–595 at 178. There are some exceptions to the ideal rule of equal distribution, which exceptions permit some creditors to receive more than their *pro rata* share of available assets, at the

expense of the other creditors. For reasons stated in the preceding sources, such exceptions are not favored. For example, creditors with security interests in specific items of estate property naturally attempt to reserve such collateral items for themselves, in spite of the trustee's attempts to liquidate the items and divide the proceeds equally among all creditors. Under some circumstances, such "selfish" creditors' efforts are allowed to succeed.

Although the trustee inherits the *debtor's* interest in property, the trustee's right (if any) to keep specific items of collateral as against the "selfish" claims of secured creditors is determined by giving the trustee certain *creditor's* rights. Under the former Bankruptcy Act,

> The trustee shall have as of the date of bankruptcy the rights and powers of: (1) a creditor who obtained a judgment against the bankrupt upon the date of bankruptcy, whether or not such a creditor exists, (2) a creditor who upon the date of bankruptcy obtained an execution returned unsatisfied against the bankrupt whether or not such a creditor exists, and (3) a creditor who upon the date of bankruptcy obtained a lien by legal or equitable proceedings upon all property, whether or not coming into possession or control of the court, upon which a creditor of the bankrupt upon a simple contract could have obtained such a lien whether or not such a creditor exists,

Act Sec. 70c (quoted in 4A *Collier on Bankruptcy* 4 (14th ed. 1978)). This provision, first introduced in 1910, has been called the "strong arm clause" of the bankruptcy laws. It was said to confer upon the trustee "a status with the consequent capacity to act, just as if he were in actuality a creditor of the kind to which the provision refers," 4B *Collier on Bankruptcy* ¶ 70.46, 559 (14th ed. 1978). Of the kinds of creditors mentioned in Act § 70c, the most important was the judicial lien creditor. "The term 'lien creditor' will generally be used as a shorthand expression ... to denote the status conferred upon the trustee by the strong-arm clause," *id.* at ¶ 70.45, 560 n. 12. The "strong-arm clause" appears in the present Bankruptcy Code as 11

U.S.C. § 544(a), which provides in pertinent part as follows:

> The trustee shall have as of the commencement of the case, an without regard to any knowledge of the trustee or of any creditor the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
>
> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

> .     .     .     .     .

The trustee is not himself a judicial lien creditor; but Federal law directs that he be treated *as if* he were one, for purposes of ascertaining the strength and priority of his claim to collateral as against other creditors. The rights of lien creditors to goods such as motor vehicles as against other secured creditors are determined by the commercial laws of the various States, and nowadays by the State versions of the Uniform Commercial Code. These state laws are, in effect, adopted by Federal law for bankruptcy purposes. The state commercial laws are adopted by Federal law merely to provide a convenient rule for fixing the trustee's rights and priorities as against certain creditors. One merely inserts the trustee onto the ladder of creditor priorities at the prescribed level—that of the lien creditor as of the date of bankruptcy—and observes whether he is higher or lower than the creditor(s) in question. If the trustee has higher priority, he has prior claim to the collateral and can liquidate it for the benefit of all creditors of the bankruptcy estate. If the trustee has lower priority, he must acknowledge the prior claim to the collateral of the secured creditor in question. In practice, the trustee will surrender the collateral or its value to the particular secured creditor, and the other creditors of the bankruptcy estate get no part of the value of that particular item. Since the trustee is not himself a lien credi-

tor, yet has rights equivalent to one, he is spoken of as an "ideal", "hypothetical" or "artificial" lien creditor.

> "[T]he trustee in bankruptcy ... by force of law, stands here as the ideal creditor, irreproachable and without notice, armed *cap-a-pie* with every right and power that is conferred by the law of the state upon its most favored creditor who has acquired a lien by legal or equitable proceedings,"

*In re Waynesboro Motor Co.*, 60 F.2d 668, 669 (D.Ct.S.D.Miss.1932). "In effect, as of the date of bankruptcy, the trustee has the whole bundle of rights by virtue of his purely *hypothetical* status," 4B *Collier* ¶ 70.50, 614 (14th ed. 1978). It is Federal law which gives the trustee the status of a lien creditor, though State law determines what the rights enjoyed by creditors of that status shall be.

And what are the rights and powers of a judicial lien creditor? State laws, and in particular the original Uniform Commercial Code § 9–301(3), drew a distinction between lien creditors *without knowledge* of prior security interests, and lien creditors *with knowledge* of prior security interests. The former had priority over prior unperfected security interests; the latter did not. (For present purposes, no distinction need be attempted between "knowledge" and "notice," or "actual" versus "inquiry" knowledge or notice, etc. *See* UCC Secs. 1–201(25), 9–301(1)(b) and *U.S. v. Ed Lusk Const. Co., Inc.*, 504 F.2d 328 (10th Cir. 1974).) The whole purpose of giving a bankruptcy trustee lien creditor status was to provide a means of determining his priority as against secured creditors-but which lien creditor status, "without knowledge" and prior, or "with knowledge" and inferior, is inured to the trustee? Given the purpose and intended operation of the "strong-arm clause," it was held "obvious that the words 'without notice' are embodied by necessary implication in the" language of the Act, *Matter of Ford–Rennie Leather Company*, 2 F.2d 750, 756 (D.C. Del.1924); *see generally*, 4B *Collier on Bankruptcy* ¶ 70.53, 636–38 (14th ed. 1978) and cases cited on p. 636–637 n. 10. It followed that perfected security interests had priority over bankruptcy trustees; but bankruptcy trustees had priority over unperfected security interests.

This simple scheme was muddled in practice by some unfortunate misconceptions. A bankruptcy trustee is not a mere assignee of creditors, but an officer empowered by Federal law to act in furtherance of Federal purposes. Yet, certain authorities insisted on treating this Federal officer as if he had no rights of his own, but was merely a representative of a particular assortment of actual creditors of a bankrupt. According to this theory, the trustee's powers were no greater than the sum of the rights and powers of the actual group of creditors which he "represented" in bankruptcy; hence, where the bankrupt's creditors were all "with knowledge" of a secured transfer, it was proposed that the bankruptcy trustee himself must be a "lien creditor with knowledge" and accordingly must lack priority even over unperfected security interests.

> Under many, if not most, state statutes relating the recordation of various instruments of transfer, it is the rule that before a creditor is permitted to prevail over an unrecorded transfer by virtue of his own lien through legal process or other status sufficient under the particular law, the creditor must achieve such status without actual notice of the unrecorded security interest. The Uniform Commercial Code renders an unperfected security interest subordinate to the claims of intervening lien creditors without notice, in § 9–301(1)(b), and by definition in Subsection (3) includes the trustee in bankruptcy within the term lien creditor. That subsection goes on to provide that unless "all creditors had knowledge of the security interest such a representative of creditors [*e.g.*, the trustee] is a lien creditor without knowledge even though he personally has knowledge of the security interest." This would mean that if all creditors did have such a knowledge, it would be imputed to the trustee, as a matter of state law. Accordingly, the question has occasionally arisen as to whether or not the fact that

all the creditors of the bankrupt had actual notice of the transfer in question has any bearing on the trustee's rights under the strong-arm clause. At first blush this seems to call for a quick and obvious answer ... But a few courts have exhibited some confused thinking on the matter, hence an analysis of the problem is in order.

A number of factors have contributed towards the difficulty of solution: the general principle in bankruptcy that the trustee represents the creditors of the estate has tended to make some courts forget the hypothetical or artificial status accorded the trustee under the strong-arm clause ... even after the amendment of 1910 first added the strong-arm clause to the Act it was difficult for a number of small courts to dispel the former notion that the trustee was *always* bound by the rights of some actual creditor of the estate ... a few courts found it difficult to accept the implications of the Bankruptcy Act that the distributees of the proceeds of a recovery by the trustee should include creditors who could not have recovered by nonbankruptcy law ...

With these factors in mind, it is easier to understand those decisions that have held in effect that before the trustee can prevail under the § 70c ... he must represent at least one creditor who did not have actual notice of the transfer sought to be avoided. It is impossible to reconcile such a holding with the now well settled principles concerning the trustee's status under § 70c. As demonstrated previously, the trustee is accorded an "ideal" status—he is the "perfect" creditor who has complied with all requirements necessary under the applicable law for a lien by legal or equitable process. He has such status irrespective of whether there are actually any such creditors in existence. He acquires his status from the Act, not from the creditors of the estate ... the fact that distribution may go to those that could not themselves have avoided the transfer has no bearing on the trustee's recovery or his status, for he recovers for the benefit of all and not on behalf of any one creditor or group of creditors. Consequently, the better reason cases have held that the trustee under § 70c has the status of a creditor *without notice,* and thus there is no necessity for demonstrating that he does or does not represent at least one actual creditor without notice ... Since the trustee has the ideal status of a creditor without notice, the question merely is one whether or not such a creditor could prevail under state law.

4B *Collier on Bankruptcy* ¶ 70.53, 634–637 (14th ed. 1978).

[Uniform Commercial Code § 9–301(3)] implies an attempt to impute knowledge to a trustee in bankruptcy, if all the creditors he represents had knowledge of the security interest. If the attempt ... is successful then an unperfected security interest would prevail against a trustee in bankruptcy under ... § 70c ... as long as all creditors had knowledge of it. It is not likely that the attempt will be successful because it does not conform to the language, intent and interpretation of § 70c. As stated previously ... the trustee is accorded an "ideal" status by § 70c; he is the "perfect" creditor who has complied with all requirements to obtain a judicial lien. He acquires his status from the Bankruptcy Act, not from the creditors of the estate. The better reason cases have held that the trustee under § 70c has the status of a creditor *without notice;* and thus there is no necessity for proving that he does or does not represent at least one actual creditor without notice, as § 9–301(3) would seem to require.

The language in § 9–301(3) is not in line with the weight of authority construing § 70c and should not be permitted to override it.

*id.,* at ¶ 70.62A[9] 727–728. In sum, it was "Congressional intent to keep the trustee free of knowledge as a matter of law," *id.* On occasion, courts deprived bankruptcy trustees of lien creditor status because all of the bankrupt's creditors had or should have had knowledge of an unperfected security interest. This either disregarded the

"obvious" intent of the Bankruptcy Act, or allowed the State Commercial Codes to overrule the Federal Bankruptcy Act in violation of the Supremacy Clause of the United States Constitution, and was patently in error. Most courts declined so to contradict the Federal Bankruptcy Act and the Supremacy Clause, and allowed bankruptcy trustees to exercise lien creditor rights as a matter of the trustee's own status *qua* trustee, whether or not lien creditors without knowledge could actually occur in any particular bankruptcy case.

If any uncertainty remained, it should have been eliminated by enactment of the Bankruptcy Code in 1978. Section 544(a) expressly provides that the bankruptcy trustee "shall have" the rights and powers of a lien creditor "without regard to any knowledge of the trustee or of any creditor."

Since lien creditors themselves do not rely on any knowledge of prior security interests in obtaining their judgment liens, it made little sense to deny *any* of them lien creditor priority status based on the extent of their knowledge of prior unperfected security interests. Accordingly, the Uniform Commercial Code itself was amended to delete from § 9–301(1)(b), (3) the references to "knowledge." This removed any conflict between the Uniform Commercial Code and the bankruptcy laws on this point. As the UCC now stands, lien creditor status is not affected by any knowledge of prior unperfected security interests.

Within the limits of the present discussion, it can accurately be said that the Bankruptcy Code cares nothing for notice, and neither does the modern Uniform Commercial Code.

■ To the extent Wheels' argument would revive the ancient heresy, and impute creditors' "notice" to the bankruptcy trustee or debtor-in-possession acting under the "strong-arm clause," such argument must be emphatically rejected.

Since Wheels cannot use "notice" to *demote the debtor-in-possession* from judicial lien creditor status, Wheels attempts instead to use "notice" to *promote itself* to perfected secured creditor status. The effect is much the same: either way, the fact that all actual creditors would have had notice is said to deny priority to the debtor-in-possession who has no notice. Wheels' subtle variation on the old heresy does involve some additional factors and principles of law, and so must be examined and dealt with on its own terms. Instead of UCC § 9–301(1)(b), (3), Wheels relies on UCC 9–402(8) and its rule of "substantial compliance."

Pursuant to Uniform Commercial Code § 9–302(1), security interests must be perfected by filing a financing statement meeting the requirements of § 9–402, except as otherwise provided. One of the exceptions is 12A O.S. § 9–302(1)(h),

> (h) A security interest in a vehicle as defined in Section 23.2b of Title 47 of the Oklahoma Statutes for which a certificate of title may be properly issued by the Oklahoma Tax Commission, except as otherwise provided for in Section 23.2b of Title 47 of the Oklahoma Statutes,

which in turn appears duplicative of the provisions of 12A O.S. § 9–302(3), which provides in pertinent part as follows:

> The filing of a financing statement otherwise required by this article is not necessary or effective to perfect a security interest in property subject to:
>
> .   .   .   .   .
>
> (b) a statute of this state that provides for central filing of, or that requires indication or delivery for indication on a certificate of title or, any security interests in the property, but, during any period in which collateral is inventory held for sale by a person who is in the business of selling goods of that kind, the filing provisions of Sections 9–401 et seq. of this title apply to a security interest in that collateral created by him as debtor;
>
> .   .   .   .   .

12A O.S. § 9–302(4) further provides:

> Compliance with a statute or treaty described in subsection (3) of this section is equivalent to the filing of a financing statement pursuant to the provisions of this article, and a security interest in

property subject to the statute or treaty can be perfected only by compliance with such statute or treaty except as provided for in Section 9–103.1 of this title on multiple state transactions.

The statute referred to in 12A O.S. § 9–302(3), (4) is part of the Oklahoma Vehicle License and Registration Act, formerly 47 O.S. § 23.2b, now 47 O.S. § 1110, which provides in pertinent part as follows:

A. 1. Except for a security interest in vehicles held by a dealer for sale or lease ... a security interest, as defined in Section 1–201 of Title 12A of the Oklahoma Statutes, in a vehicle as to which a certificate of title may be properly issued by the Oklahoma Tax Commission shall be perfected only when a lien entry form prescribed by the Commission, and the existing certificate of title, if any, or application for a certificate of title and manufacturer's certificate of origin containing the name and address of the secured party and the date of the security agreement and the required fee are delivered to the Commission or to a motor license agent.... The filing and duration of perfection of a security interest, pursuant to the provisions of Title 12A of the Oklahoma Statutes, including, but not limited to, Section 9–302 of Title 12A of the Oklahoma Statutes, shall not be applicable to perfection of security interests in vehicles as to which a certificate of title may be properly issued by the Commission, except as to vehicles held by a dealer for sale or lease ... In all other respects Title 12A of the Oklahoma Statutes shall be applicable to such security interests in vehicles as to which a certificate of title may be properly issued by the Commission.

2. Whenever a person creates a security interest in a vehicle, such person shall surrender to the secured party the certificate of title or the signed application for a new certificate of title, ... and the manufacturer's certificate of origin. The secured party shall deliver the lien entry form and the required lien filing fee within ten (10) days as provided hereafter with certificate of title or the application for certificate of title and the manu-

facturer's certificate of origin to the Commission or to a motor license agent. If the lien entry form, the lien filing fee and the certificate of title or application for certificate of title and the manufacturer's certificate of origin are delivered to the Commission or to a motor license agent within ten (10) days after the date of the lien entry form, perfection of the security interest shall begin from the date of the execution of the lien entry form, but, otherwise, perfection of the security interest shall begin from the date of the delivery to the Commission or to a motor license agent.

3. a. For each security interest recorded on a certificate of title, or manufacturer's certificate of origin, such person shall pay a fee of Ten Dollars ($10.00), ... Upon the receipt of the lien entry form and the required fees with either the certificate of title or an application for certificate of title and manufacturer's certificate of origin, a motor license agent shall, by placement of a clearly distinguishing mark, record the date and number shown in a conspicuous place, on each of these instruments....

5. Any person creating a security interest in a vehicle that has been previously registered in the debtor's name and on which all taxes due the state have been paid shall surrender the certificate of ownership to the secured party. The secured party shall have the duty to record the security interest as provided in this section and shall, at the same time, obtain a new certificate of title which shall show the secured interest on the fact of such certificate of title.

6. The lien entry form with the date and assigned number thereof clearly marked thereon shall be returned to the secured party ...

7. The Commission shall have the duty to record the lien upon the face of the certificate of title issued at the time of registering and paying all fees and taxes due on such vehicle.

B. 1. A secured party shall, within fifteen (15) business days after the satisfaction of such security interest, furnish

directly or by mail a release of a security interest to the Commission and mail a copy thereof to the last-known address of the debtor. If the secured party fails to furnish such release as herein required, the secured party shall be liable to the debtor for a penalty of One Hundred Dollars ($100.00) and, in addition, any loss caused to the debtor by such failure....

C. The Commission shall file and index certificates of title so that at all times it will be possible to trace a certificate of title to the vehicle designated therein, identify the lien entry form, and the names and addresses of secured parties, or their assignees, so that all or any part of such information may be made readily available to those who make legitimate inquiry of the Commission as to the existence or nonexistence of security interest in the vehicle.

These provisions may be summarized as follows: under Oklahoma law, security interests in motor vehicles are perfected not by filing financing statements pursuant to 12A O.S. § 9–302(1), 9–401 *et seq.*, but only by delivery of a lien entry form and payment of the required fee to the Oklahoma Tax Commission. The secured creditor must, in effect, identify itself as such by submitting a lien entry form designating the secured creditor as such; pay the prescribed fee therefor; release the security interest in due course, or owe certain penalties to the debtor; and provide such information *in the lien entry form* as will permit the Oklahoma Tax Commission to answer any request as to whether a particular vehicle is subject to a security interest. These requirements must be met whether the vehicle is new or not, and regardless of what may or may not appear on any certificate of title. The lien entry form is required *in addition to* any certificate of title or application therefor. It is *the lien entry form* which will cause the Oklahoma Tax Commission to note the lien as such on the certificate of title, to index it accordingly, and thus enable it to ascertain, on request, whether any particular vehicle is subject to a security interest. This method is exclusive—if it is not complied with,

there is no perfection, *Liberty Nat'l Bank & Trust Co. of Okla. City v. Garcia,* 686 P.2d 303 (Okla.1984), *In re Thompson,* 101 B.R. 658 (B.C.N.D.Okla.1989), *In re Breece,* 58 B.R. 379 (B.C.N.D.Okla.1986), *In re The Chief Freight Lines Co.,* 37 B.R. 436 (B.C. N.D.Okla.1984), *In re Haning,* 35 B.R. 242 (B.C.N.D.Okla.1983). For an exception specified by statute, *see* 12A O.S. § 9–103.1; *In re Foster,* 611 P.2d 232 (Okla.1980); *In re B & S Motor Freight, Inc.,* 59 B.R. 259 (B.C.N.D.Okla.1986).

U.C.C. § 9–402 prescribes the requirements of a financing statement, and ¶ (8) thereof provides that "A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading." Since Section 9–402 deals only with financing statements, it has no necessary application to methods of perfection other than financing statements (such as certificates of title, lien entry forms, and other devices required by State motor vehicle laws in lieu of financing statements). The motor vehicle laws themselves may call for strict compliance with their requirements, or they may permit deviations comparable to the treatment of financing statements in Section 9–402. How liberally a motor vehicle act should be read depends, in the last analysis, on the motor vehicle act itself, and not on Section 9–402(8). For example, if a motor vehicle act authorized by 12A O.S. § 9–302(1)(h), (3)(b) expressly stated that "Compliance with this Act is strictly required regardless of 12A O.S. § 9–402(8)," then strict compliance with its terms would be required. A similar legislative intent might be implied by various provisions of the motor vehicle act, even if not expressly stated. The point is that Section 9–402 applies of its own force only to financing statements and need not apply in any way to non-financing-statement devices. No court is justified in jumping to the conclusion that any particular motor vehicle act *must* be read in light of Section 9–402(8). This is expressly stated in 12A O.S. § 9–302(4), and is suggested by the limited adoption of "the filing provi-

sions of Sections 9–401 *et seq.*" by 12A O.S. § 9–302(3)(b).

As noted above, 47 O.S. § 1110(A)(1) provides in part that "[t]he filing and duration of perfection of a security interest, pursuant to the provisions of Title 12A of the Oklahoma Statutes, including, but not limited to, Section 9–302 of Title 12A of the Oklahoma Statutes, shall not be applicable to perfection of security interests in vehicles ... except as to vehicles held by a dealer for sale or lease. In all other respects Title 12A of the Oklahoma Statutes shall be applicable to such security interests in vehicles...." The statutory language is ambiguous: it might be read to *forbid* application of 12A O.S. § 9–402(8) to perfection of security interests in vehicles; or it might be read to *require* application of 12A O.S. § 9–402(8) to perfection of security interests in vehicles. In *In re Hembree: Woodson v. General Motors Acceptance Corp.*, 635 P.2d 601 (Okla.1981) and *In re Cook: Woodson v. Ford Motor Credit Co.*, 637 P.2d 588 (Okla.1981), the Oklahoma Supreme Court held that 12A O.S. § 9–402(5), now (8), did apply to the Oklahoma Motor Vehicle Act's provisions prescribing the method of perfecting security interests in motor vehicles. Those opinions do not mention the ambiguous language of the Motor Vehicle Act itself, nor take account of either the express provisions of 12A O.S. § 9–304(2) or the negative implication of 12A O.S. § 9–302(3)(b). But they are the Oklahoma Supreme Court's latest word on the matter, and will be followed by this Court.

The purpose of U.C.C. Section 9–402(8) is made clear by the draftsmen's comments on the UCC official text, carried over without change (except for renumbering of the subsection) from the comments on the original subsection 9–402(5), as follows:

Subsection (8) is in line with the policy of this Article to simplify formal requisites and filing requirements and is designed to discourage the fanatical and impossibly refined reading of such statutory requirements in which courts have occasionally indulged themselves. As an example of the sort of reasoning which this subsection rejects, *see General Mo-*

*tors Acceptance Corporation v. Haley*, 329 Mass. 559, 109 N.E.2d 143 (1952). In the cited case, General Motors Acceptance Corporation ("GMAC") filed a "statement of trust financing receipt" intended to protect its security interest in various items of collateral. The debtor or "trustee's" correct name was "E.R. Millen Co., Inc." The statement named the trustee "E.R. Millen Company," was signed by "E.R. Millen Trustee," and included the trustee's correct address and a correct description of the collateral. The trial court held the statement fatally defective because it did not contain the trustee's correct name. On appeal, GMAC argued

that the statute merely requires that the trustee be so designated that a creditor or other interested person would not be misled as to the identity of the trustee; and here, it is said, no one could be deceived because of the resemblance of name, the identity of address, and the description of the goods acquired by the trustee,

*GMAC*, 109 N.E.2d at 146. Nevertheless, the Massachusetts Supreme Court affirmed the trial court—a ruling which certainly merits the UCC draftsmen's description as "fanatical and impossibly refined."

The purpose of Section 9–402(8), then, is to validate financing statements which contain essentially complete and correct information, save for "minor errors" of the sort appearing in *GMAC v. Haley, e.g.*, variances among "Inc.," "Co." and "Company," and other such trivial inaccuracies of commission or omission which do not render the financing statement essentially false or do not "amount to substantial non-compliance," 49 Op.Atty.Gen.Md. 476 (1984), 2 U.C.C.R. 108, 110. Whether errors are "minor" or are "seriously misleading" depends on the facts of each case, *In re Strickland*, 94 B.R. 898 (B.C.N.D.Miss. 1988), *In re Service Lawn & Power, Inc.*, 83 B.R. 515 (B.C.E.D.Tenn.1988), *First Agri Services, Inc. v. Kahl*, 385 N.W.2d 191 (Ct.App.Wis.1986), *In re Mount*, 5 U.C.C.R. 653 (D.Ct.S.D.Ohio 1968); and on factors such as good faith, commercial reasonableness, the substantive purpose of ac-

tual notice to creditors, the actual harm or lack of harm from deviations, and the need for enforcement of uniformity and regularity in compliance with statutory directives. The latter policy is especially important where the UCC intermeshes with other laws, *In re Mount,* 5 U.C.C.R. at 655.

Oklahoma cases are few but are generally in accord. *Consolidated Equipment Sales, Inc. v. First State Bank & Trust Co. of Guthrie,* 627 P.2d 432 (Okla.1981) is digested in Oklahoma Statutes Annotated under 12A O.S. § 9–402(8), but actually deals with sufficiency of description of collateral under § 9–402(1) and does not mention § 9–402(8) at all. *In re Hembree: Woodson, Trustee v. General Motors Acceptance Corp.,* 635 P.2d 601 (Okla.1981) validated a lien entry form which was not signed by the secured party, noting that such signature was not specifically required by the statute, 47 O.S. § 23.2b, and "[i]t is conceded that the secured party is in full compliance with all other requirements and the form has been properly filed," *Hembree,* 635 P.2d at 604. *In re Cook: Woodson, Trustee v. Ford Motor Credit Co.,* 637 P.2d 588 (Okla.1981) validated a lien entry form which "contains all of the statutorily required information" but also included "an 18–day error in the notation of the date" of the security agreement, *Cook,* 637 P.2d at 590. The court cited with approval other rulings that total omission of an item specifically required by statute was a "major" and not a "minor" error, and that "major" error constituting "substantial failure to comply with the statutory requirement" was not excused by § 9–402(8); *see In re Cook,* supra, 637 P.2d at 590, citing *In re Benson,* 3 U.C.C.R. 272 (D.Conn.1966) and *In re Vielleux,* 5 U.C.C.R. 277 (D.Conn.1967).

In the case now before this Court, the certificates of title misname the secured party as the "owner", do not contain the real owner's name or address at all, and do not disclose the existence, let alone the date, of any security agreement. These misstatements and omissions are not inadvertent but are deliberate and intentional, committed in furtherance of a scheme to misrepresent the true nature of the trans-

action between these parties and the *role* (and in that sense, at least, the "identity") of the secured party herein. Such intentional deviations from accuracy are not "errors" at all, in the usual sense of that word indicating mistakes or accidents. Since they are not "errors," they are not excused by Section 9–402(8), whether or not they are "minor." But if they are "errors," they are not "minor" ones. They are not comparable to the trivial slip-ups, equivalent to slight misspellings, in *GMAC v. Haley.* It is true that a persistent searcher might find in these certificates, read against a background of extrinsic evidence (i.e., prior knowledge that the vehicles are in Otasco's hands), some hint of the existence, name and whereabouts of a disguised secured party. This alone does not convert major omissions into "minor" ones. According to Wheels, if a fault is not *invariably fatal,* then it isn't even *serious.* In any event, whatever is on the certificates of title, it must be observed that no lien entry form was ever delivered, or even attempted to be delivered, to the Oklahoma Tax Commission, and so of course the fee required therefor was never paid. According to Wheels, the total nondelivery of a lien entry form is "substantial compliance" with a statute requiring delivery of a lien entry form as a condition of perfection in no uncertain terms. If all this is "substantial compliance," it would seem that just about anything short of a certificate of title in blank must be "substantial compliance."

This is in essence what Wheels proposes. According to Wheels, there is enough information on the certificate of title (never mind how it got there) to suggest to a diligent inquirer (who already knows the extrinsic fact that the vehicles are actually in Otasco's hands) that something is amiss and that further inquiry is appropriate (and to direct inquiries to the proper place, Wheels' offices). Wheels says the mere giving of such information, however inaccurate or incomplete, constitutes perfection. In other words, says Wheels, notice is perfection. Wheels' approach, if approved, would demolish the UCC's policy of encouraging routine compliance with clear,

simple, statutorily-prescribed methods of achieving perfection. It would do likewise to the Oklahoma Motor Vehicle Act's policy of enabling the Oklahoma Tax Commission to determine, by resort to lien entry forms, whether or not a given vehicle is subject to a security interest (since the Oklahoma Tax Commission cannot be expected to make reliable answer to the query whether some vehicle is subject to a security interest, if such answer depends on extrinsic evidence combined with implications or suggestions that may or may not arise from the face of the title absent any lien entry form). It is true that perfection is meant to give notice, but notice alone does not give perfection. Only perfection gives perfection. Perfection means giving such notice as is required by law, *in the manner and to the extent prescribed by law.* Nothing else will suffice to accomplish perfection. Here, Wheels may have given notice, of some sort, in some manner, in some degree. But Wheels certainly has not followed the procedure prescribed by 47 O.S. § 1110 as the "only" method by which Wheels could give such notice as would accomplish perfection. In *Liberty National Bank & Trust Co. of Oklahoma City v. Garcia,* 686 P.2d 303 (Okla.1984), the Oklahoma Supreme Court held that it is *delivery* of a properly filled out *lien entry form,* and not notice of this or that, which accomplishes perfection of a security interest in a motor vehicle.

All things considered, the doubtful good faith of a secured creditor masquerading as a "lessor;" the complete omissions and misleading partial entries on the certificate of title; the total failure to deliver, or even attempt to deliver, a lien entry form as specifically required by statute; the intentional character of these acts and omissions; and the commercial unreasonableness of this attempt to turn a simple, forthright disclosure into a guessing game, the Court concludes that Wheels' noncompliance with 47 O.S. § 1110 is not "minor," is "seriously misleading," and does not rise to the dignity of "substantial compliance" under 12A O.S. § 9–402(8).

Given its systematic and extensive noncompliance with the statutory requirements for perfection, Wheels cannot be taken seriously when it claims "substantial compliance" with the statutory perfection requirements. Wheels simply did not perfect, and did not even attempt to perfect. Rather, Wheels concocted a procedure which, Wheels proposes, is the functional equivalent of perfection, because this improvised procedure gives somewhat the same notice as would be given by perfection. Wheels wants its do-it-yourself alternative to perfection treated as if it were "the real thing." Such a principle, if once admitted, would demolish the UCC's perfection scheme. But, in any event, in bankruptcy Wheels' attempted substitute for perfection fails. Despite all Wheels' machinations in "giving notice," the bankruptcy Trustee, as a matter of Federal law, has no notice. And, as discussed above, any attempts to smuggle notice to the Trustee into the Bankruptcy Code must fail. Since Wheels' interest is an unperfected security interest of which the bankruptcy Trustee has no notice, Wheels' interest is inferior to that of the Trustee.

Wheels cites *In re Circus Time, Inc.,* 641 F.2d 39 (1st Cir.1981) to the contrary, and observes that

The overwhelming majority of other courts that have decided this issue have adopted the First Circuit's rationale in *In re Circus Time* and have held that substantial compliance with Certificate of Title Acts by the listing of the lessor/seller as the owner on the certificate of title is sufficient to perfect a security interest in a motor vehicle. *See, e.g., In re Load–It Inc.,* 774 F2d 1077 (11th Cir. 1985) (applying Georgia law); *In re National Welding of Michigan, Inc.,* 61 Bankr. 314 (W.D.Mich.1986); *In re Carraway,* 65 Bankr. 51 (Bankr.E.D.N.C. 1986) (dictum); *In re Yeager Trucking,* 29 Bankr. 131 (Bankr.D.Colo.1983); *In re McCall,* 27 Bankr. 106 (Bankr.W.D.N.Y. 1983); *In re Loague,* 25 Bankr. 940 (Bankr.N.D.Miss.1982); *In re Coors of the Cumberland, Inc.,* 19 Bankr. 313 (Bankr.M.D.Tenn.1982); *In re Trivett,* 12 Bankr. 373 (Bankr.E.D.Tenn.1981) (applying Indiana law),

Wheels' brief p. 17. To this list may be added *In re Thummel: Kirtley, Trustee v. General Motors Acceptance Corporation et al,* 109 B.R. 447 (N.D.Okla.1989).

To the extent that *In re Circus Time, Inc.,* and its progeny, conflict with the views herein expressed, those cases would seem to deviate from the weight of authority under the former Bankruptcy Act, to disregard the Supremacy Clause and/or the express command of 11 U.S.C. § 544(a), to exaggerate the intended operation of U.C.C. § 9–402(8), and to confuse notice with perfection. To that extent, such cases are not persuasive and will not be followed by this Court. In any event, *In re Circus Time, Inc.,* is distinguishable in this respect: the State laws involved in *In re Circus Time, Inc.,* required notation of information on the face of certificates of title (not delivery of lien entry forms) to accomplish perfection; the secured creditor in *In re Circus Time, Inc.,* had managed to get at least some entries onto the face of the certificate of title, and the issue was whether such entries, though inaccurate and incomplete, "substantially complied" with the perfection requirements. In the present case, delivery of lien entry forms (not notation on the face of the title) is the sole means of perfection. There has been no delivery of any lien entry forms whatever in this case.

In *In re Thummel,* the Court, on the strength of an unduly expansive reading of *In re Hembree, supra,* and *In re Cook, supra,* held as follows:

> In light of these cases, the Court finds that GMAC's action in obtaining a certificate of title listing it as "owner" of the Vehicle gave notice to interested parties of its interest in the Vehicle so that no third party could be prejudiced by GMAC's failure to have its lien noted on the title. Therefore, under Oklahoma law, GMAC substantially complied with the requirements for perfecting its security interest, and the Court finds that such security interest is perfected. In reaching this conclusion, the Court respectfully declines to follow the decision of Judge Wilson in *In re Thompson* [supra], in which Judge Wilson concluded

that "a security interest in a motor vehicle is perfected solely by delivery of a lien entry form to the Oklahoma Tax Commission ..." See *Thompson* at 677 ... It is not clear whether Judge Wilson considered the argument that lessors in *Thompson* had "substantially complied" with Oklahoma perfection requirements since there is no discussion of that issue.

*In re Thummel,* 109 B.R. at 451. The ruling in *In re Thompson,* 101 B.R. 658 (B.C.N.D.Okla.1989), that "a security interest in a motor vehicle is perfected solely by delivery of a lien entry form to the Oklahoma Tax Commission" merely paraphrases the language of the Oklahoma Motor Vehicle Act, *Thompson,* 101 B.R. at 677. Courts are not at liberty to "decline to follow" the positive command of statutes. And total nondelivery of a lien entry form is total noncompliance with the statute; total noncompliance cannot be passed off as "substantial compliance." For these reasons, this Court respectfully declines to follow *In re Thummel.*

Wheels calls this result "inequitable," Wheels' brief p. 19. From a bankruptcy standpoint, Wheels' failure to perfect results in distribution of the proceeds of these vehicles among all creditors (including Wheels) *pro rata,* a highly equitable result. In attempting to keep these proceeds to itself, it is Wheels which seeks to deflect the usual course of equity. The precise issue presented is not a matter of "pure" bankruptcy law; and the Uniform Commercial Code's perfection provisions are legal and not equitable in nature. Wheels has not shown circumstances raising an estoppel or other equitable obstruction to the normal operation of the Uniform Commercial Code's perfection requirements. Wheels, which has deliberately misrepresented its status as a secured creditor, is in no position to demand any extraordinary interventions of equity in its behalf. Under such circumstances, equity follows the law. Wheels has simply failed to do what the law requires to accomplish perfection. Therefore, Wheels must suffer the consequences prescribed by the law for failure to perfect. The result satisfies both

equity (in bankruptcy) and law (in the Uniform Commercial Code).

AND IT IS SO ORDERED.